## Richmond

### EDMUND P. NACCASH, M.D.

### V.

### JOSEPH BURGER, ET AL.

April 30, 1982.

Record No. 791548.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, and Stephenson, JJ.

*John F. Gionfriddo* for appellant.

*Haynie S. Trotter (Terrence Ney; Harold P. Green [D.C.]; Jonathan L. Kempner [D.C.]; Boothe, Prichard & Dudley; Fried, Frank, Harris, Shriver & Kampelman [D.C.],* on brief), for appellees.

CARRICO, C.J., delivered the opinion of the Court.

The determinative question presented by this appeal is whether a cause of action exists in favor of parents for the so-called "wrongful birth" of a child. The question arose in the context of a motion for judgment filed in the trial court by Joseph Burger and Trudy Burger against Edmund P. Naccash, M.D., and certain other health care providers. The motion alleged that the defendants had negligently failed to discover that the fetus carried by Trudy Burger was affected by an incurable genetic disorder, causing her to forego an abortion and carry the child to term. The Burgers sought damages for the care and treatment of the child and for their mental anguish and suffering.

All the defendants except Dr. Naccash were dismissed by the trial court. The case against Dr. Naccash was submitted to a jury, which returned a verdict in favor of the Burgers for $180,948.06. We awarded Dr. Naccash an appeal from the final order confirming the verdict.

The record shows that Carrie Burger, the child in question, was born February 20, 1974, and that she died October 6, 1976, of Tay-Sachs disease. Tay-Sachs is an invariably fatal disease of the brain and spinal cord that occurs in Jewish infants of eastern Eu-

ropean ancestry. A diseased child appears normal at birth, but, at four to six months, its central nervous system begins to degenerate, and it suffers eventual blindness, deafness, paralysis, seizures, and mental retardation. The life expectancy of an afflicted child is two to four years.

At the time of the events in question, a blood test was in general use throughout the country to identify carriers of the Tay-Sachs trait among potential parents having Jewish ancestry. A carrier is not affected by Tay-Sachs, but a child whose parents both are carriers stands a 25% chance of having the disease. If tests show that both parents are carriers, a further test known as amniocentesis is recommended to determine whether the fetus is afflicted with Tay-Sachs.[1]

Both Joseph and Trudy Burger are of eastern European ancestry. On September 5, 1973, when Mrs. Burger was three and one-half months pregnant with Carrie, her first child, the Burgers went to Arlington Hospital for Tay-Sachs tests. They were interviewed by Rosalie Green, a technician in the Cytogenetics Laboratory. Ms. Green advised the Burgers that there was no need to test Mrs. Burger unless Mr. Burger tested positive. Accordingly, Ms. Green withdrew blood from Mr. Burger alone. The blood was placed in two tubes labeled only with a number ostensibly assigned to Joseph Burger. The blood sample then was forwarded to a medical facility in Richmond for analysis, pursuant to arrangements previously made by Dr. Naccash and Ms. Green.

Subsequently, Ms. Green reported to the Burgers that the test results showed Mr. Burger was not a Tay-Sachs carrier. Satisfied with the report, Mrs. Burger "went ahead and had" her baby. Although the child developed normally at first, at four months she began showing signs of abnormality. She was examined and found to have Tay-Sachs.

Further tests showed that both Mr. and Mrs. Burger were Tay-Sachs carriers. The original blood sample purportedly withdrawn from Mr. Burger on September 5, 1973, was retested and again found negative. A postive sample supposedly withdrawn from another man at Arlington Hopsital on the same date was also retested and again found positive. However, new tests of the other man's blood showed he was not a Tay-Sachs carrier. These cir-

---

[1] Amniocentesis involves the analysis of amniotic fluid withdrawn from the mother's uterus. The analysis reveals whether there are gross chromosome defects present in the fetus.

cumstances prompted an expert witness to testify below that "only one conclusion . . . can be drawn, and that is [Mr. Burger's] blood sample was incorrectly labelled [by Arlington Hospital]." The same witness stated that the error could have been averted simply by identifying each sample with the initials as well as the number of the particular donor.

Both Joseph and Trudy Burger testified that, had they known they were Tay-Sachs carriers, they would have insisted upon an amniocentesis and, if that test showed the fetus was afflicted with Tay-Sachs, Mrs. Burger would have had an abortion.[2] Mrs. Burger expressed her feeling in these words: "There is nothing on this earth that would have made me have a baby with Tay-Sachs Disease."

The Burgers outlined for the jury the tragic course of the disease in Carrie and the nature and extent of the care and treatment she required as her condition degenerated; in her final months, she was confined in the Northern Virginia Training Center, where she ultimately died. The parents also recounted the emotional stress and mental anguish they suffered as a result of the child's worsening condition. Finally, the Burgers detailed the expenses they claimed for Carrie's care and treatment. The expenses totaled $30,948.06, including $2,274.26 for costs connected with Carrie's funeral and grave marker.

On appeal, Dr. Naccash contends that the essence of the parents' claim is for "wrongfully permitting the birth of the child to occur" and that, if a cause of action exists for this claim, it exists on behalf of the child alone and not the parents. Noting that this is a case of first impression in Virginia, Dr. Naccash cites *Howard* v. *Lecher,* 42 N.Y.2d 109, 366 N.E.2d 64, 397 N.Y.S.2d 363 (1977), where a physician had failed to test Jewish parents to determine whether their child would be affected by Tay-Sachs disease. When the child was born with Tay-Sachs, the parents brought a damage action against the doctor for their emotional stress and for the expenses of the child's care and treatment. By stipulation, the claim for care and treatment expenses was discontinued. On the claim for emotional stress, the court held that "[n]o cause of action exists . . . for the unintentional infliction of

---

[2] In 1973, when the Burgers were given the erroneous Tay-Sachs report, Code § 18.1-62.1 provided that it was lawful for a physician to perform an abortion if in his medical opinion there was "a substantial medical likelihood that the child will be born with an irremediable and incapacitating mental or physical defect."

harm to a person solely by reason of that person's mental and emotional reaction to a direct injury suffered by another." 42 N.Y.2d at 112, 366 N.E.2d at 66, 397 N.Y.S.2d at 365.

As the Burgers point out, however, *Howard* does not stand for the proposition that parents have no cause of action at all for damages sustained as a result of the birth of an impaired child; the decision disallowed only emotional damages. Eighteen months after *Howard,* the New York court decided in *Becker* v. *Schwartz,* 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978), that parents can recover care and treatment damages resulting from a wrongful birth.

The Burgers rely upon *Becker* and a New Jersey decision, *Berman* v. *Allan,* 80 N.J. 421, 404 A.2d 8 (1979). In *Berman,* the parents of a child born afflicted with Down's Syndrome, or mongolism, brought an action against physicians for their failure to inform the parents of the availability of amniocentesis to determine whether the fetus was defective. The parents claimed damages both for the expenses necessary to raise the child and for their own past and future mental and emotional suffering. The New Jersey court held that the parents could not recover the expenses necesary to raise the child, stating that the parents desired to retain all the benefits inhering in the birth of the infant while saddling the defendants with the enormous expense of raising the child. This result, the court opined, would be wholly disproportionate to the culpability involved, would constitute a windfall to the parents, and would place an unreasonable financial burden upon the physicians. 80 N.J. at 432, 404 A.2d at 14.

However, the court upheld the parents' right to recover emotional damages. The court stated that, in failing to inform the mother of the availability of amniocentesis, the physicians "directly deprived her—and, derivatively, her husband—of the option to accept or reject a parental relationship with the child and thus caused them to experience mental and emotional anguish upon their realization that they had given birth to a child afflicted with Down's Syndrome." 80 N.J. at 433, 404 A.2d at 14.[3]

---

[3] The *Berman* decision to permit recovery of emotional damages is of special interest because it represents the reversal of a position taken by the New Jersey court twelve years earlier in *Gleitman* v. *Cosgrove,* 49 N.J. 22, 227 A.2d 689 (1967). One of the reasons assigned by the court for its change in view was that the Supreme Court's ruling in *Roe* v. *Wade,* 410 U.S. 113 (1973), had altered the public policy against allowing damages for "the denial of the opportunity to take an embryonic life." 80 N.J. at 431, 404 A.2d at 14.

The Burgers rely also upon *Gildiner v. Thomas Jefferson Univ. Hospital,* 451 F. Supp. 692 (E.D. Pa. 1978). There, blood tests of the prospective parents revealed that both were Tay-Sachs carriers. An amniocentesis showed, however, that the fetus was unaffected by the disease. Foregoing the option of abortion, the mother proceeded with the pregnancy and gave birth to a child afflicted with Tay-Sachs. Contending that no cause of action existed on behalf of the parents, the defendants argued, *inter alia,* that the damages sought were not recoverable and that any cause of action should be created by the legislature. The court rejected these arguments and, anticipating what the Pennsylvania Supreme Court would decide, ruled that the parents could recover the expenses for the medical treatment of the child.[4]

■ Because Dr. Naccash's argument suggests this court should defer to the legislature, we note with special interest the *Gildiner* court's observation on the question:

[The] holding that the [parents] have stated a cause of action for damages caused by negligence in the performance and interpretation of an amniocentesis involves the application of the doctrine of negligence . . . to a recently developed medical procedure. The determination of the scope of the common law doctrine of negligence is within the province of the judiciary.

451 F.Supp. at 696. Whether a cause of action exists for the wrongs complained of and the damages sought here is a question that should be determined, in our opinion, according to traditional tort principles. Only a novel twist in the medical setting differentiates the present situation from the ordinary malpractice action. Hence, like the *Gildiner* court, we believe we need not defer to the legislature, but may appropriately decide the question ourselves.[5]

---

[4] The court reserved judgment on the question whether the parents could also recover damages for emotional pain and suffering. In a case decided subsequently, *Speck* v. *Finegold,* 497 Pa. 77, 439 A.2d 110 (1981), the Pennsylvania Supreme Court recognized a cause of action permitting parents to recover damages for their mental distress and physical inconvenience and for expenses attributable to the birth and raising of their genetically afflicted child.

[5] In addition to New Jersey, New York, and Pennsylvania, whose cases have been previously cited herein, courts in Illinois, Michigan, South Carolina, Texas, and Wisconsin have recognized a cause of action in favor of parents for the wrongful birth of a child. *Robak* v. *United States,* 658 F.2d 471 (7th Cir. 1981) (applying Alabama law); *Eisbrenner* v. *Stan-*

██ Essential to the recognition of a cause of action in favor of the Burgers is the existence of a legal duty owed them. Clearly, when the Burgers presented themselves to the Cytogenetics Laboratory at Arlington Hospital for Tay-Sachs testing, they were owed the duty of reasonable care in the handling of the blood withdrawn for the tests; this duty encompassed the obligation to provide them with reasonably accurate information concerning the condition of their unborn child so they could make an informed decision regarding abortion.

██ Then, there must be a breach of the duty. Beyond question, there was a breach in this case; indeed, the negligence of Rosalie Green in mislabeling Joseph Burger's blood is virtually conceded.

██ Also essential to a cause of action for the Burgers is a showing of a causal connection between the breach of duty and any claimed injury or damage. The evidence establishes that, as a result of the negligent mislabeling of Mr. Burger's blood, his sample was switched with the sample withdrawn from another man on the same date; because the Burgers received a negative Tay-Sachs report, they decided to continue the pregnancy rather than abort the fetus.

██ The final link essential to the recognition of a cause of action in favor of the Burgers is the existence of actionable injury, meaning direct, rather than indirect, injury. Following the lead of the New Jersey court in *Berman,* we hold that the erroneous Tay-Sachs report given Mrs. Burger deprived her, and, derivatively, her husband, of the opportunity to accept or reject the continuance of her pregnancy and the birth of her fatally defective child; this, in our opinion, was direct injury.

██ It follows that the Burgers are entitled to recover those damages which are the reasonable and proximate consequences of the breach of the duty owed them, *viz.,* consequences that a reasonable and informed person could have foreseen or anticipated. *Tullock v. Hoops,* 206 Va. 665, 668-69, 145 S.E.2d 152, 154 (1965). In applying these standards, we agree with the New York court's holding in *Becker* that parents injured as the Burgers have been injured are entitled to recover damages for expenses incurred in the care and treatment of their afflicted child. In this respect, we disagree with the New Jersey court's holding in *Berman* to the

*ley.* 106 Mich. App. 357, 308 N.W. 2d 209 (1981); *Phillips v. United States,* 508 F.Supp. 537 (D.S.C. 1980); *Jacobs v. Theimer,* 519 S.W.2d 846 (Tex. 1975); *Dumer v. St. Michael's Hospital,* 69 Wis.2d 766, 233 N.W.2d 372 (1975).

extent that it disallowed the claim for care and treatment expenses.

The consideration that prompted the New Jersey court's disallowance, *viz.,* the enormity of the financial burden that might be imposed upon the negligent physician, is not present here. The child in *Berman* was still alive and could anticipate an extended life span. Carrie Burger's life span was measured in months, and the cost of her care and treatment was relatively inexpensive. Even so, we do not necessarily agree that, if liability is established and the damages claimed are compensable and just, the court should perform a balancing test between competing economic interests in determining whether an injured party is entitled to a particular category of damages.

■ We do agree with Dr. Naccash, however, concerning part of the expenses the trial court permitted the jury to consider. That part, obviously allowed by the jury, consists of the costs connected with Carrie's funeral and grave marker. These items of damage were not proximate consequences of the breach of duty involved in this case. Carrie Burger's death was caused by Tay-Sachs disease. The disease was not caused by Rosalie Green's failure to handle properly Joseph Burger's blood, but by hereditary factors. Yet, we need not reverse the trial court's judgment for this error; we can simply modify the judgment by subtracting the amount of the expenses we now disallow.

■ This bring us to the question of the Burgers' entitlement to damages for emotional distress. As a general rule, such damages are not recoverable unless they result directly from tortiously caused physical injury. Our decisions demonstrate, however, that there are exceptions to this general rule.

In *Hughes* v. *Moore,* 214 Va. 27, 34, 197 S.E.2d 214, 219 (1973), we held that where the claim is for emotional distress *and* physical injury resulting therefrom, recovery is permissible notwithstanding the lack of physical impact, *provided* there is shown by "clear and convincing evidence" an "unbroken chain of causal connection between the negligent act, the emotional disturbance, and the physical injury." And in *Womack* v. *Eldridge,* 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974), we held that emotional distress resulting directly from a non-tactile tort may be compensable, *provided* "four elements are shown," *viz.,* that the tort is intentional or reckless, that the tort-feasor's conduct is outrageous and intolerable, that the wrongful conduct and the emotional dis-

tress are causally connected, and that the emotional distress is severe.

Dr. Naccash contends that the Burgers have not brought their claim for emotional damages within the rationale of either *Hughes* or *Womack*. He argues that the Burgers have proved neither physical injury resulting from emotional distress nor emotional distress resulting from intentional or reckless conduct. Therefore, Dr. Naccash maintains, the parents' "entire claim rests on their witnessing the birth, suffering, and death of their child," and thus any injury to the parents was "indirect rather than direct."

■ We believe, however, that the circumstances of this case justify another exception to the general rule that damages for emotional distress are not allowable unless they result directly from tortiously caused physical injury. The restrictions upon recovery imposed by the provisos in *Hughes* and *Womack* were designed to discourage spurious claims asserted by chance witnesses to physical torts involving others. The considerations prompting imposition of the limitations do not exist here; no one suggests that the Burgers' emotional distress was feigned or that their claim was fraudulent. Indeed, to apply the restrictions here, or to refuse to recognize an exception to the general rule, "would constitute a perversion of fundamental principles of justice." *Berman,* 80 N.J. at 433, 404 A.2d at 15.

Furthermore, we believe it would be wholly unrealistic to say that the Burgers were mere witnesses to the consequences of the tortious conduct involved in this case. In our view, the parents' emotional distress was no less a direct result of wrongful conduct than the distress endured by the plaintiffs in *Hughes* and *Womack;* the evidence shows an unbroken chain of causal connection directly linking the erroneous Tay-Sachs report, the deprivation of the parents' opportunity to accept or reject the continuance of Mrs. Burger's pregnancy, and the emotional distress the parents suffered following the birth of their fatally defective child.

■ Before leaving the subject of emotional damages, we note an argument advanced by Dr. Naccash concerning an instruction granted by the trial court that permitted the jury to award damages for any humiliation or embarrassment suffered by the Burgers. Dr. Naccash asserts that one may recover damages for humiliation and embarrassment only if he suffers some disfigurement or deformity resulting from an injury, and the Burgers of-

fered no evidence to support such a proposition. We believe, however, that, while the jury properly might have inferred the Burgers were humiliated and embarrassed by the course of events involving their daughter's illness, the granting of the instruction, if error, was harmless; the evidence of other factors affecting emotional distress was so overwhelming that the instruction could have had only inconsequential impact upon the jury.

██ Remaining for disposition is a contention by Dr. Naccash that, even if a cause of action exists in favor of the Burgers, he is not liable thereon. The evidence fails to show, Dr. Naccash maintains, that a doctor-patient relationship ever existed between him and the Burgers or their afflicted child. He would be liable for the negligence of Rosalie Green, Dr. Naccash submits, only on the basis of the doctrine of respondeat superior, and the evidence fails to establish the necessary master-servant relationship between him and Ms. Green to support liability under that doctrine.

The record discloses that the case was submitted to the jury upon instructions delineating the respective positions of the parties concerning the doctrine of respondeat superior. The jury's verdict in favor of the Burgers necessarily determined that a master-servant relationship existed between Dr. Naccash and Ms. Green. The question, therefore, is whether the evidence supports that determination.

The evidence shows that the Cytogenetics Laboratory at Arlington Hospital formerly was under the supervision of Dr. William Dolan, chief of pathology. He employed Rosalie Green in 1969, and she worked under him as a technician in the Laboratory, although her salary was paid by the hospital. In February, 1973, Dr. Dolan determined that the workload of the Laboratory did not justify continuance of the facility, and he terminated Ms. Green's employment. Dr. Dolan testified below that it was his belief Dr. Naccash then hired Ms. Green and that she was under Dr. Naccash's supervision thereafter.

Dr. Naccash, a private-physician member of the staff, was chief of the department of obstetrics and gynecology at the hospital. When he learned of Dr. Dolan's plan to close the Cytogenetics Laboratory, Dr. Naccash urged that it be kept open "so the community . . . and the doctors in the community" could "make use of it." He proposed that, if the Board of Trustees would provide "some space," he would be willing, without compensation, to oversee the operation of the Laboratory and supervise Ms. Green in

her work; under the arrangement, "the hospital would have nothing to do with hiring, firing, making decisions or anything." The Board agreed to the proposal and directed the hospital administrator to prepare a written contract, but one was never prepared.

In his testimony, Dr. Naccash took the position that, because his agreement with the hospital was never formalized by a written instrument, he was without "any authority or power" with respect to the Cytogenetics Laboratory; he claimed the "department was running by itself." He admitted, however, that he had testified in a pretrial deposition that he was the acting head of the Laboratory pending the formalization of his agreement with the hospital.

Ms. Green testified that, when Dr. Dolan indicated an intention to close the Laboratory, it was transferred to Dr. Naccash and the latter thereafter supervised her work. She testified further that she reported directly to Dr. Naccash; that she had frequent communications with him and consulted him "[m]ost of the time" about problems and policies; that he made the decision to add the Tay-Sachs program to the Laboratory's activities and participated in making arrangements for the program's implementation; and that he approved using numbers alone on test tubes containing blood intended for Tay-Sachs analysis.

Ms. Green was placed on administrative leave in September, 1974, and her employment was terminated effective December 31, 1974. The personnel form terminating Ms. Green's employment, admitted as an exhibit, states:

> The Cytogenetics Laboratory has been abolished pursuant to the recommendation of the Medical Staff of the hospital. Mrs. Green functioned as the Cytogeneticist under the direction of Dr. Naccash who was responsible for the over-all operation of the Laboratory. With the abolishment of the Laboratory the position of the Cytogeneticist was also abolished.

Dr. Dolan was asked at trial whether Dr. Naccash had terminated Ms. Green's employment; the witness stated, "[a]pparently so."

Four factors enter into determination of the question whether a master-servant relationship exists within the contemplation of the doctrine of respondeat superior, (1) selection and engagement of the servant, (2) payment of compensation, (3) power of dismissal, and (4) power of control. The first three factors are not essential to the existence of the relationship; the fourth, the power of con-

trol, is determinative. *Whitfield* v. *Whittaker Mem. Hospital,* 210 Va. 176, 181, 169 S.E.2d 563, 567 (1969); *A. C. L. R. Co.* v. *Tredway's Admx.,* 120 Va. 735, 744-45, 93 S.E. 560, 562-63 (1917), *cert. denied,* 245 U.S. 670 (1918).

It is clear that, during the period pertinent to this case, Ms. Green's salary was paid by the hospital and not Dr. Naccash; hence, any question concerning factor (2) must be resolved in Dr. Naccash's favor. With respect to the existence or nonexistence of factors (1) and (3), there was evidence from which the jury could have decided either way. But, with respect to factor (4), *viz.,* the power of control, the evidence was overwhelming that Dr. Naccash not only held the power to control Ms. Green's actions but also exercised the power whenever necessary; indeed, the only contrary evidence is Dr. Naccash's assertion that the "department was running by itself." Hence, there was ample evidence to support the jury's finding that a master-servant relationship existed between Dr. Naccash and Ms. Green.

Citing *Whitfield,* however, Dr. Naccash argues that a fifth factor must be considered in determining whether a master-servant relationship exists. He quotes from the *Whitfield* opinion, where we said that "the work has to be done on the business of the principal or for his benefit." 210 Va. at 181, 169 S.E.2d at 567. Dr. Naccash asserts that Ms. Green's activities were not on his business or for his benefit. But the quoted statement means only that the servant must have acted within the scope of his or her employment to render the master liable for the agent's torts. There can be no question in this case that Ms. Green was acting within the scope of her employment when she handled the blood sample withdrawn from Mr. Burger.

We will modify the judgment of the trial court by subtracting therefrom $2,274.26, representing the costs connected with Carrie Burger's funeral and grave marker, thus reducing the award to $178,673.80. In all other respects, the judgment will be affirmed.

*Modified and, as modified, affirmed.*

COCHRAN, J., dissenting in part.

I agree that, under the "wrongful birth" concept, the Burgers had a justiciable cause of action for medical malpractice against Dr. Naccash. There was evidence from which the jury reasonably

could find, as authorized by Instruction 10, that Rosalie Green was the servant or agent of Dr. Naccash, that she was working within the scope of his employment, that she was negligent, and that her negligence was the proximate cause of the mislabeling of the vial containing Burger's blood sample. Accordingly, under the instruction, the jury could find, and it did, that Dr. Naccash was liable for Green's negligence.

I do not agree, however, with the measure of damages approved by the majority. In my view, damages for the Burgers' emotional distress cannot be justified under *Hughes* v. *Moore,* 214 Va. 27, 197 S.E.2d 214 (1973) or *Womack* v. *Eldridge,* 215 Va. 338, 210 S.E.2d 145 (1974). In *Hughes,* we permitted recovery of damages for emotional distress if accompanied by physical injury only upon proof by clear and convincing evidence of the causal connection between the negligence, the emotional distress, and the injury. In *Womack,* we approved the allowance of damages for emotional distress, unaccompanied by physical injury, only where the following elements are shown:

> One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe.

*Id.* at 342, 210 S.E.2d at 148.

There was no physical injury to the Burgers accompanying their emotional distress, to bring them within the purview of the *Hughes* rationale, and the evidence shows that the conduct of Naccash's servant did not meet either of the first two prerequisites mandated by *Womack.* As I understand it, the majority would simply remove those two requirements of *Womack* and permit recovery for mental suffering proximately caused by the defendant's negligence.

The majority rely heavily upon *Berman* v. *Allan,* 80 N.J. 421, 404 A.2d 8 (1979), in which the New Jersey Supreme Court reversed an earlier decision and permitted parents to recover damages for emotional distress caused by a "wrongful birth." Nevertheless, the court declined to permit recovery for the medical and other expenses incurred in maintaining the defective child.

I prefer the reasoning of the New York Court of Appeals in *Becker* v. *Schwartz,* 46 N.Y.2d 401, 386 N.E.2d 807 (1978), that pecuniary loss is compensable but that emotional distress is too speculative to permit recovery and is a matter best left for legislative determination. *See Howard* v. *Lecher,* 42 N.Y.2d 109, 366 N.E.2d 64 (1977). The effect of the majority opinion in the present case is to remove all restrictions upon the award of damages, except to eliminate those expenses allowable only in a wrongful death action, thus venturing into a position far behond that approved in either *Berman* or *Becker.*

No one can fail to deplore the anguish experienced by these unfortunate parents. A pecuniary award, regardless of its size, cannot compensate them for their sorrow. But to permit recovery for emotional distress, embarrassment, and humiliation in the birth and deterioration of their afflicted child is legally unwarranted. The majority is making a policy decision that not only may have a chilling impact upon members of the medical profession but, by making the practice of defensive medicine more widespread, may indeed have an adverse effect upon the public. It is better to have the General Assembly, rather than this Court, provide a forum for opposing views, and, after weighing the conflicting societal interests, make the necessary policy decision. Absent legislative sanction, I would not extend the measure of damages beyond that approved in *Womack.* Accordingly, I would reverse the judgment, deduct from the total expenses of $30,948.06 the sum of $2,274.26 for expenses incident to the child's burial and enter judgment for the Burgers in the amount of $28,673.80.

THOMPSON, J., joins in dissent.

COMPTON, J., dissenting in part.

I would allow recovery of the expenses incident to burial of the child and thus would affirm the judgment of the trial court without modification.

In excising the costs of the child's funeral and grave marker from the expenses allowed, the majority employs inconsistent reasoning. It is illogical for the majority to say that expenses of care and treatment due to the wrongful birth are recoverable and in the same breath deny recovery of the burial expenses, when without the wrongful birth there would have been no death, necessitating the expense of burial.

In my opinion, the jury properly was allowed to determine whether, in the language of the damage instruction given in this case, the funeral expenses "proximately resulted" from the defendant's negligence.