16 F.3d 410
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Stephanie NEY, Plaintiff-Appellant,
v.
LANDMARK EDUCATION CORPORATION; Ron Zeller, Defendants-Appellees,
and
Werner Erhard; Werner Erhard and Associates; Peter Sias, Defendants.
 No. 92-1979.
 United States Court of Appeals, Fourth Circuit.
 Argued: October 26, 1993.
Decided: February 2, 1994.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, Chief District Judge. (CA-91-1245-A)
 Richard Alan Seligman, Washington, D.C., for appellant.
 Robert Powel Trout, Dunnells & Duvall, Washington, D.C.,, or appellees.
 Gerald F. Ragland, Jr., Carter, Kramer & Ragland, Alexandria, Virginia, for appellant.
 John Thorpe Richards, Jr., Dunnells & Duvall, Washington, D.C., for appellees.
 E.D.Va.
 AFFIRMED.
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 A damage suit by Stephanie Ney was brought against Werner Erhard and a corporation wholly owned by him, Werner Erhard & Associates (WE & A). Also joined as defendants were 1) Landmark Education Corporation (Landmark) which had purchased the assets of WE & A, 2) Peter Sias, and 3) Ronald Zeller. Landmark conducted activities, especially The Forum, which were, in substantial degree, like those which WE & A had conducted. Claims against Sias were withdrawn while Ronald Zeller, a former employee of WE & A, it being contended that he was a leader of The Forum, remained as a defendant with respect to claims of intentional infliction of emotional distress.
 
 
 2
 WE & A and Erhard were not personally served, nor did they appear in the district court or on appeal. A default judgment for $501,970 was entered against them but is not before us on appeal. We, therefore, express no opinion on its validity.
 
 
 3
 In September 1989, Ney attended a program known as"The Forum," conducted by Erhard d/b/a/ WE & A. The Forum, a successor to the well-known "est" program, might be described as a group therapy/self-improvement program.
 
 
 4
 Ney's attendance at The Forum apparently passed without incident, and she left the weekend spent attending it feeling satisfied and hoping to return. As a result of her experience at The Forum, however, she decided that she should become more open in her life. To that end, two days later she confessed to her husband a"crush" that she had on a fellow graduate student. Ney's husband in turn told her that he had conducted several extramarital affairs. The following day she confessed her crush to her faculty advisor, who explained that the graduate student should be avoided since he was a Satan worshipper and had wrecked marriages in the past.
 
 
 5
 Ney began a process of psychological decompensation. At the end of a three-day period she had a psychotic break with reality, suffered apparently permanent psychological injuries, and had to be hospitalized at the Psychiatric Institute of Montgomery County for fourteen days. While in the hospital, she was medicated and at times strapped to a bed in four-point restraints to prevent her from harming herself.
 
 
 6
 WE & A originally was established in the 1970's to deliver a program known as "est" or the "est training." The est training was phased out in 1984, and in 1985 WE & A began offering a program named "The Forum." Landmark was a newly formed company managed by employees of the now defunct WE & A, which had purchased the assets of Erhard and received a license from him to run the Forum.
 
 
 7
 The Forum was alleged to have caused severe emotional upset in some participants, and it was claimed that the defendants were on notice for many years of such "casualties," yet failed to give adequate warnings or adopt changes in the program.
 
 
 8
 At the time Ney attended the Forum, it was owned by Erhard, doing business under the trade name WE & A. Erhard was the sole owner. He was also the sole owner of Werner Erhard & Associates International (WE & AII), which delivered the Forum outside the United States.
 
 
 9
 By December, 1990 Erhard had been the subject of substantial adverse publicity. The time came when, to avoid adverse publicity associated with his name, Erhard approached his top executives about selling the assets and licensing another entity to continue to present the Forum. Soon after, the Internal Revenue Service issued a Notice of Levy for $7 million on Erhard's assets.
 
 
 10
 At the time of the sale, WE & A consisted of a business with offices in 21 cities throughout the United States. After the sale, Landmark continued to operate out of the same offices, presenting the same programs throughout the United States. As of the date of the sale, WE & A had 216 employees. Most of the same employees remained with Landmark. Landmark acquired all assets of WE & A that were necessary to continue to present the Forum. Landmark also acquired the right to use the names and addresses of all individuals who had completed the Forum.
 
 
 11
 After the sale, WE & A ceased doing business, and Landmark began doing business immediately with the assets and the license acquired from WE & A and Erhard. There was little change in the format of the Forum. At the time of the sale, Landmark's six directors were highlevel employees of WE & A and WE & AII. Neither Donald Cox nor Erhard, however, became part of Landmark. The key negotiators for Landmark in the sale of WE & A assets consisted of the same group of top executives, one of whom was Erhard's brother. The only bidder aside from Landmark was Cox.
 
 
 12
 The parties calculated the value of WE & A's assets at $8,600,000. Landmark also acquired Erhard's stock in WE & AII, which was valued at $1,200,000. Landmark agreed, as payment for the WE & A assets and WE & AII stock, to assume liabilities in the amount of $6,800,000 and to pay an additional $3 million to Erhard. The agreed on downpayment of $300,000 was paid out of the account of WE & AII, whose stock was sold to Landmark. The $2,700,000 balance was to be paid by January 30, 1992, but payment was later extended and the due date delayed.
 
 
 13
 Landmark obtained from Erhard a license to present the Forum for 18 years in the United States and internationally with the exception of Japan and Mexico. Erhard retained ownership of the license. The license was not assignable without Erhard's express written consent, and was to revert to Erhard after 18 years.
 
 
 14
 Furthermore, under the Agreement, Erhard was promised 2% of Landmark's gross revenues payable on a monthly basis and, in addition, 50% of the net (pre-tax) profit payable quarterly. Such payments to Erhard were not to exceed a total payment of $15 million over the 18 year term of the license.
 
 Claims of Personal Injury
 
 15
 The assertions Ney sought to prove were claims of negligent infliction of emotional distress as well as other negligence claims brought by Ney. In addition, she sought to prove that Landmark was but a mere continuation of WE & A.
 
 
 16
 Ney asserts that the district court erred in granting Landmark's and Zeller's motion for summary judgment with respect to her claim of negligent infliction of emotional distress. Her principal criticism of the district court is that it misinterpreted Virginia's requirement that there be some physical injury associated with a claim for negligent infliction of emotional distress. In addition, she has asserted on appeal that the district court failed to recognize that her Complaint asserted negligence claims beyond mere infliction of emotional distress, including claims for "psychological" and physical injuries.
 
 
 17
 Despite her attempt to segregate her claims into three distinct sorts of injuries, at bottom, she seeks relief for infliction of emotional distress. She relies almost exclusively on cases considering that type of damage, and it is clear that her claims for psychological, physical, and emotional damage are, in fact, intertwined.
 
 
 18
 To support her claim that the district court misinterpreted Virginia law in awarding summary judgment to Landmark and Zeller, Ney relies on three Virginia cases, Naccash v. Burger, 223 Va. 406, 290 S.E.2d 825 (1982); Hughes v. Moore, 214 Va. 27, 197 S.E.2d 214 (1973); and Howard v. Alexandria Hosp., 429 S.E.2d 22 (Va.1993). She has read the cases as either requiring an extremely low threshold of physical harm to accompany a claim for emotional distress, or, in some cases, as allowing claims for emotional distress to proceed with no physical injury whatsoever. In addition, she has argued that her psychological injury, psychosis, has rendered her case distinguishable from Virginia cases preventing recovery for pure emotional harm. She has read Naccash as eliminating entirely the physical injury requirement where, as here, there is no claim that the harm is feigned or fraudulent.
 
 
 19
 Even if physical injury is required, moreover, Ney has claimed that her "injuries" would meet the requirements of Virginia law. She has argued that, since she has been treated with medication, her injuries have a "biochemical" aspect that is "physical" and "material." She also has suffered headaches. Finally, she has suffered rectal bleeding ascribed to lithium which has been prescribed for her. Although none of these injuries has been disputed, their nature and their cause remain in dispute.
 
 
 20
 Claims for purely emotional distress are "not favored in the law." Ruth v. Fletcher, 237 Va. 366, 377 S.E.2d 412, 415 (1989). Courts are reluctant to embrace such claims, because they require difficult questions of proof and causation, and fraudulent emotional injuries can be difficult to detect.
 
 
 21
 Like other states, Virginia has attempted to cabin the universe of emotional-distress claims by requiring the plaintiff to show some accompanying physical injury. The plaintiff must prove that the "physical injury was the natural result of fright or shock proximately caused by the defendant's negligence." Hughes, 197 S.E.2d at 219. The general rule of proximate cause is also narrowed, so that recovery is permitted "if, but only if, there is shown a clear and unbroken chain of causal connection between the negligent act, the emotional disturbance, and the physical injury." Id.; Myseros v. Sissler, 239 Va. 8, 387 S.E.2d 463, 464 (1990).
 
 
 22
 Ney has read the Virginia case of Naccash v. Burger as eliminating the physical injury requirement "entirely where there was no claim that the harm was feigned or fraudulent, the harm was the direct rather than the indirect result of the negligent conduct and the causal connection is unbroken." Br. of Appellant, at 17. Since in the instant case, neither party contends that her injuries are fraudulent, Ney asserts that the policy rationales for disfavoring claims of emotional distress are not applicable here, and that, therefore, Naccash controls.
 
 
 23
 Naccash, a wrongful birth action, involved the emotional distress suffered by the parents of a child born with Tay-Sachs disease. Naccash v. Burger, 290 S.E.2d 825 (Va.1982). In that case, the Virginia Supreme Court refused to apply the general rule enunciated in Hughes v. Moore, which required that physical injury accompany the claim for emotional distress. The court observed:
 
 
 24
 [T]he circumstances of this case justify another exception to the general rule that damages for emotional distress are not allowable unless they result directly from tortiously caused physical injury. The restrictions upon recovery ... were designed to discourage spurious claims asserted by chance witnesses to physical torts involving others. The considerations prompting imposition of the limitations do not exist here; no one suggests that the [parents'] emotional distress was feigned or that their claim was fraudulent. Indeed, to apply the restrictions here ... would constitute a perversion of fundamental principles of justice.
 
 
 25
 Naccash, 290 S.E.2d at 831 (emphasis added) (citation omitted). Further, the Naccash Court found that the evidence showed an "unbroken chain of causal connection directly linking" the parents' claim for emotional distress and the birth of the child. Id.
 
 
 26
 Ney's attempt to apply the Naccash holding to the instant case must be rejected, however, for in a recent case, the Virginia Supreme Court explicitly stated that the Naccash exception to the physical injury rule is unique and "confined to its particular facts." Myseros, 387 S.E.2d at 464 n. 2; accord Bulala v. Boyd, 239 Va. 218, 389 S.E.2d 670, 674 n. 1 (1990); see also Timms v. Rosenblum, 713 F.Supp. 948, 955 (E.D. Va.1989) ("Plaintiff's heavy reliance on the Naccash and Bulala decisions is misplaced. These decisions are sui generis and this Court finds no warrant in Virginia law for extending those decisions beyond the specific egregious facts there presented."), aff'd, 900 F.2d 256 (4th Cir.1990) (Table). Indeed, although it has not been claimed that Ney's condition was fictitious, it cannot be said, as she has claimed, that it is not of the type of harm that might be faked and so would support the policy rationale of the physical injury requirement of Virginia law. In any event, contrary to Ney's assertion, Virginia law expressly requires that a claim for emotional distress be accompanied by physical injury and the Naccash exception does not come into play.
 
 
 27
 On the assumption that the physical injury requirement does exist under Virginia law and here applies, Ney has claimed that her injuries were sufficient to meet the Hughes test.[1] She has noted that Hughes itself required only a slight physical injury. The Hughes plaintiff witnessed a car crashing into her front porch. She became nervous, felt pains in her chest and arms, could not breast feed, and her menstrual cycle began. Hughes, 197 S.E.2d at 215-16. In the instant case, Ney complains of injuries that "clearly have a biochemical element which is physical and material since she has been treated on more than one occasion with medication." Br. of Appellant, at 19. Additionally, she has suffered headaches, and rectal bleeding, which she attributes to the Lithium she was prescribed.
 
 
 28
 While Hughes may require only minimal physical injuries, the case cannot be read as dispensing with the physical injury requirement altogether. It seems clear that the "biochemical element" of psychosis, to the extent that it in fact exists, does not rise to the level of physical injury required by Hughes. In addition, the Hughes plaintiff could show an unbroken chain between the accident and her symptoms. Here, there is substantial evidence in the record that Ney received a number of blows to her psyche besides those sued on in the same week she attended the Forum.
 
 
 29
 Ney has also attempted to rely on the rectal bleeding to fulfill the physical injury requirement. The difficulty with that argument is that the rectal bleeding was caused by prescribed medication, not by the Forum. As support, Ney has attempted to rely on a recent Virginia Supreme Court case, Howard v. Alexandria Hosp., 429 S.E.2d 22 (Va.1993). In Howard, a case decided after summary judgment was granted in the instant case, the Virginia Supreme Court considered a claim for emotional distress arising out of medical malpractice. In Howard, the defendant hospital failed to sterilize properly operating instruments before surgery was performed on the plaintiff. The hospital admitted that it was negligent, that its negligence caused the plaintiff's injuries, and that she was reasonably distressed by the remedial treatment the hospital required thereafter. Although the plaintiff never actually acquired any disease from the negligent hospital procedure, she had to remain hospitalized longer than normal, had to receive antibiotics, and had an intravenous line inserted and blood drawn.
 
 
 30
 Ney has attempted to show that her injuries were sufficient to sustain a claim of "professional negligence," not merely negligent infliction of emotional distress. She has claimed that the Virginia Supreme Court rejected in Howard the theory advanced by Landmark and Zeller in the instant case:
 
 
 31
 The defendant's argument actually is a contention that the plaintiff sustained no direct physical injury, only emotional disturbance. But the plaintiff's evidence, at the very least establishes a prima facie case of injury.
 
 
 32
 The term "injury" means "positive, physical or mental hurt to the claimant." ... Clearly, as a result of the hospital's use of inadequately sterilized instruments, the plaintiff sustained positive physical and mental harm.
 
 
 33
 As a direct result of the wrong, the plaintiff's body was invaded by intravenous tubes, needles administering"pain shots," and instruments used to withdraw blood. She experienced the physical pain and discomfort for headache, nausea, vomiting, fever, chills, and unusual sweating.... Her "symptom complex" was due to enterocolitis, a side effect of the antibiotic therapy "necessarily prescribed" because of the hospital's negligence.
 
 
 34
 Id. at 24-25 (emphasis added) (citations omitted). Appellant has asserted that both "[i]n Howard and in [the instant] case the physical symptoms were secondary to medical treatment." Br. of Appellant, at 21. Her claim is that, just as the doctors in Howard were negligent for the failure to meet medical standards, so should the Forum be liable for the injury caused by their practice of "psychotherapy." The problem, however, with Ney's reading of Howard is that the Howard court clearly was confronted with a case of emotional distress arising out of the physical injury caused by the negligent hospital, not a case, as here, of physical harm allegedly arising out of emotional or psychological injury. The hospital's malpractice arose out of its physical battery of the Howard plaintiff. Here there is no such physical battery, and even were the Forum held to have committed "malpractice" that claim could not arise out of emotional injury. Howard does not dispense with the general and consistently applied Virginia rule that physical injury is a necessary element of a claim for emotional distress.
 
 
 35
 Howard is distinguished further by Myseros, 387 S.E.2d 463 (Va.1990), the same case that limited Naccash to its facts. In Myseros, the Virginia Supreme Court rejected the notion that symptoms of emotional harm could satisfy the physical injury requirement. The Myseros plaintiff alleged that his emotional problems, which stemmed from a traffic accident, were "accompanied by sweating, dizziness, nausea, difficulty sleeping and breathing, constriction of the coronary vessels, two episodes of chest pain, hypertension, unstable angina, and an electrocardiogram showing marked ischemia loss of appetite and weight, change in heart function, and problems with the heart muscle." Id. at 465. He also claimed "headaches, dizziness, and chest pain." Id. He had been under constant psychiatric care since the accident which had caused his problems. Id. The Supreme Court of Virginia reversed a jury verdict in favor of the plaintiff and found, as a matter of law, that symptoms such as these simply did not satisfy the physical injury requirement of Virginia law. Id. at 466. ("What Hughes v. Moore requires, however, and what this case lacks, is clear and convincing evidence of 'symptoms' or 'manifestations' of physical injury, not merely of an underlying emotional disturbance.") (emphasis in original). The unmistakable thrust of Virginia law is that psychiatric disorder of the kind suffered by Ney simply is not recognized as actionable absent physical injury.
 
 
 36
 Moreover, it is uncontested that the rectal bleeding complained of was the result of the drug administered to Ney by her psychiatrist. The bleeding was not caused directly by the Forum, unlike the physical invasions in Howard, which were caused by the negligent hospital. Finally, as Landmark and Zeller have pointed out, Ney's assertion that her receipt of medication established a "biochemical element" to the harm she suffered, remains an unsubstantiated hypothesis. No evidence supports her contention, and no experts testified to it.
 
 
 37
 The district court properly awarded summary judgment to Landmark and Zeller. Although none of Ney's "physical" symptoms have been disputed, they cannot overcome Virginia's test for negligent infliction of emotional distress. Moreover, to the extent that Ney's argument is that the Forum, as a "psychotherapy" exercise, caused her injury through medical malpractice, the argument is undeveloped. While Ney has characterized her complaint as stating a cause of action for "effectively practicing psychotherapy without credentials or training," she nowhere has demonstrated how the claim should be considered. To the extent that her claim for "professional negligence" is legitimate, it only concerns the standard of care. Causation has not yet been shown and Ney still may not recover because her injuries are not cognizable under Virginia law.
 
 
 38
 Similarly, although perhaps her participation in the Forum might have led in part to her psychotic reaction, even if that nexus had been established, Ney did not produce sufficient proof to recover under Virginia law.
 
 Successor Liability
 
 39
 We now turn to consideration of the attempt to hold Landmark liable on a theory of successor liability.[2] Ney has grounded her argument for successor liability on the theory that Erhard, the owner of WE & A, has maintained "ownership" over Landmark through a combination of control over the license to present The Forum and his receipt of Landmark profits.
 
 
 40
 Since Ney's claim for successor liability was dismissed on a motion for directed verdict, the court must accept her facts as presented in her case in chief, and afford her the benefit of all reasonable inferences therefrom. Wright & Miller, Federal Practice and Procedure, Sec. 2524, at 543-45.
 
 
 41
 There are four traditional exceptions to the general rule of nonliability of a successor corporation for the debts or torts of a predecessor:
 
 
 42
 In order to render the purchasing company personally liable for the debts of the selling corporation, it must appear that (a) there be an agreement to assume such debt; (b) the circumstances surrounding the transaction must warrant a finding that there was a consolidation of the two corporations [the de facto merger exception]; or (c) that the purchasing corporation was a mere continuation of the selling corporation; or (d) that the transaction was fraudulent in fact.
 
 
 43
 Crawford Harbor Associates v. Blake Constr. Co., Inc., 661 F.Supp. 880, 883 (E.D. Va.1987); Harris v. T.I., Inc., 243 Va. 63, 413 S.E.2d 605, 609 (1992). Ney has asserted that the district court erred when it stated, following her motion for reconsideration, that "under the mere continuation exception, there must be identity of the officers, directors and stockholders in the selling and purchasing corporations." Br. of Appellant, at 22. Ney has claimed that the district court incorrectly determined that the ownership of the buyer must be identical to that of the seller, when "the correct standard in Virginia is whether there was 'substantial' commonality between the management or ownership of the predecessor and successor corporations." Id. at 23.
 
 
 44
 Relying on a treatise of corporation law, Ney has concluded that the "touchstone of the 'mere continuation' doctrine is whether the successor corporation as a whole is 'substantially the same' as its predecessor. What the test really comes down to is whether the 'purchasing corporation maintains the same or similar management and ownership but wears a new hat.' " Br. of Appellant, at 24 (quoting W. Fletcher, Cyclopedia of the Law of Private Corporations at Sec. 7124.10, 291-292).
 
 
 45
 Moreover, in addition to arguing that successor liability arises out of the "mere continuation" prong of the four-part test articulated above, Ney has asserted alternatively that either a de facto merger[3] occurred or that the transaction between Landmark and WE & A was fraudulent.[4]
 
 
 46
 She relies on the following factual predicate for all three theories: consideration was insufficient; the management of the two corporations was composed of essentially the same people; Landmark continued operating the business in an uninterrupted manner at the same physical locations throughout the nation, using the same assets and facilities; and, virtually all of the same employees continued working for Landmark after the sale.
 
 
 47
 Finally, Ney has insisted that the jury should have been able to consider the question of continuity of ownership. She asserts that since the $300,000 downpayment was made not by Landmark but by WE & AII, the international branch of WE & A, Erhard himself effectively was buying the company at the same time he was selling it. The failure of Landmark to pay the balance owed of $2,700,000 on time is further evidence, she alleges, that the transaction was fraudulent. Ney has argued that Erhard's licensing agreement in which he was allowed 2% of the annual gross revenue and 50% of the net pre-tax profits should have given the jury enough evidence to conclude that "ownership" had remained unchanged throughout the transaction.
 
 
 48
 Before discussing the facts of the instant case, it bears noting that Virginia law governing "mere continuation" for successor liability is stricter than the interpretation which Ney has offered. The Virginia Supreme Court recently reaffirmed its definition principle of successor liability:
 
 
 49
 A common identity of the officers, directors, and stockholders in the selling and purchasing corporations is the key element of a "continuation".
 
 
 50
 Harris, 413 S.E.2d at 609 (emphasis added); see also United States v. Carolina Transformer Co., 978 F.2d 832, 838 (4th Cir.1992) ("The traditional rule with regard to the 'mere continuation' exception is that a corporation is not to be considered the continuation of a predecessor unless, after the transfer of assets, only one corporation remains, and there is an identity of stock, stockholders, and directors between the two corporations.").
 
 
 51
 Although Ney has asserted that Virginia law requires only a "substantial commonality for ownership or management," she has done so without authority, and Virginia law appears to hold the contrary.[5] Harris, 413 S.E.2d at 609; Taylor v. Atlas Safety Equipment. Co., 808 F.Supp. 1246, 1251 (E.D. Va.1992) ("Key element ... is 'a common identity of the officers, directors, and stockholders in the selling and purchasing corporations.' " Crawford, 661 F.Supp. at 884-85 (no liability without continuity of ownership, management and inadequate consideration).
 
 
 52
 The problem here is that while the successor corporation continued the work of its predecessor, there is not a continuation of the corporate entity of the predecessor. See, Taylor, 808 F.Supp. at 1251 (essential inquiry is whether there has been continuation of the seller's corporate entity, not whether there has been a continuation of its business operations).[6] WE & A was a sole proprietorship owned by Werner Erhard.[7] Landmark is owned by its employees, and Erhard owns no stock in the new company.
 
 
 53
 The question of whether there was identity of management is more difficult to ascertain. There is evidence that with one or two exceptions, all of the executives of Landmark are the same as all of the executives of WE & A. The difficulty with the argument advanced by Ney is that it appears that while there was substantial overlap in personnel, it cannot be said that there was identity of management, since the primary "managers" of WE & A did not continue as a part of Landmark. Indeed, Donald Cox, the chief executive officer of WE & A, competed with Landmark to buy WE & A's license and lost out to Landmark.
 
 
 54
 Nevertheless, on review of a directed verdict, the facts must be viewed in a light most favorable to the non-moving party, and it is conceivable that because almost all of the managers of the predecessor corporation continued to manage the successor corporation, a jury could conclude that there was an identity of management. Such an apparent dispute of fact, however, is not material since the test for continuity in Virginia still turns primarily on ownership, and, as discussed above, ownership changed hands. See Taylor, 808 F.Supp. at 1251 ("it appears that identity of ownership is the most important component [under Virginia law] to sustain a finding of mere continuation").
 
 
 55
 Finally, Ney has argued that the consideration paid by Landmark to Erhard was insufficient since the downpayment was paid "not by the buyer" but by WE & AII, and because the $2.7 million balance of the purchase price was not paid on time. Even if the issue of consideration were significant to a determination of "mere continuation," which it is not under Virginia law, Landmark has made a persuasive case that the consideration was adequate. In the first place, the $300,000 was paid out of corporate stock in WE & AII acquired by Landmark. Whether Erhard withdrew the $300,000 from the WE & AII treasury before the sale or whether he received it, as he did, after the sale, is immaterial. In either case, the value of WE & AII was worth $300,000 less to the purchasing company than it would have been without the payment. Finally, there is no evidence in the record to suggest that the $2.7 million is not a genuine debt and that it will not be paid. Landmark negotiated an extension for payment, and that extension was granted.
 
 Conclusion
 
 56
 While there is much in the record suggesting that Ney's psychological difficulties are real and quite terrible, her negligence claims against the Forum when conducted under WE & A ownership cannot be supported under Virginia law. And, while there should be legitimate concern over changes in corporate form undertaken by an individual and his wholly owned corporation who, among other things, apparently owe the federal government millions of dollars in unpaid taxes, the lack of identity in the two corporations makes proper the district court's directed verdict on the successor liability.
 
 The judgment is accordingly
 
 57
 AFFIRMED.
 
 
 
 [1]
 Landmark and Zeller have pointed out that Ney never alleged physical injury until she presented her opposition to summary judgment, which was filed two months after the pretrial conference and after the close of discovery. While it is true that there was no pleading in the complaint specifically setting out a claim of physical injury, we will, for the sake of argument, assume the claim is properly before us
 
 
 [2]
 Because of our holding that Virginia law does not permit Ney to recover for her alleged injuries, Ney cannot in any event hold Landmark liable unless Landmark is deemed liable as a successor entity for the default judgment entered against WE & A and Erhard. As indicated in the body of this opinion, we express no opinion as to the validity of that default judgment. Assuming, however, arguendo only, that that judgment is valid, we reach the successor liability issue pertaining to Landmark and decide that issue in favor of Landmark for the reasons set forth infra in this opinion
 
 
 [3]
 Appellant has asserted but does not argue the de facto merger theory. It plainly does not apply to the facts of the instant case. See, e.g, Bud Antle, Inc. v. Eastern Foods, Inc., 758 F.2d 1451, 1458 (11th Cir.1985) ("a consolidation or merger always involves a transfer of the assets and business of one corporation to another in exchange for its securities ") (emphasis added). Here, Landmark exchanged no stock for the assets sold by Erhard. See Crawford, 661 F.Supp. at 884 ("The essential characteristic of a de facto merger is the succession of the selling corporation's stockholders to stockholder status in the purchasing corporation.") (citation omitted). Erhard owned all the stock in WE & A. He owns none of the stock in Landmark
 
 
 [4]
 The district court dismissed the fraud claim on the ground of improper pleading, saying that "fraudulent conveyance was never pled by plaintiffs." (July 8, 1992, Tr. Vo. III, p. 22) (cited in Br. of Appellant, at 36)
 Appellant objects, saying that when the Court earlier ruled against defendant's motion for summary judgment on the successor liability issue, it must have done so in part on appellant's memorandum in opposition, which contained an assertion of fraud. Since the District Court did not grant summary judgment on successor liability, appellant infers that the Court sub silentio denied defendant's objections to the fraud claim. Therefore, appellant asserts defendant "was on notice well in advance of trial of plaintiff's intent to pursue this theory of successor liability." Br. of Appellant, at 37.
 
 
 [5]
 Ney has relied heavily on the Fourth Circuit's unpublished opinion in Acme Boot Co. v. Tony Lama Interstate Retail Stores, Inc., 929 F.2d 691 (4th Cir.1991) (unpublished), for the proposition that ownership may be understood more broadly than it was by the District Court. Tony Lama does indeed share many similarities with the instant case. There, a majority of the Court decided to remand the case, because it believed that the continued association of the prior owner and the successor corporation could allow a finding by the jury of successor liability. Judge Wilkins wrote separately in favor of judgment for the defendant. Following the remand, the district court entered judgment for the defendant. While the Tony Lama case does share similarities with the instant case, it did not contradict Virginia law. The panel merely sent the case back for further factual determination in the District Court. As controlling authority, the unpublished opinion seems rather weak and in any event is not precedent
 
 
 [6]
 Ney has attempted to distinguish between the "mere continuation" exception recognized in Virginia, and the "substantial continuation" exception recognized in a minority of other jurisdictions. The "substantial continuation" theory, applied mainly to tort cases, relaxes the requirements of identity of ownership and employment, and allows a variety of other factors to determine whether there is successor liability. The more generous standard would be helpful to Ney, but it has been rejected expressly by the Supreme Court of Virginia. Harris v. T.I., Inc., 243 Va. 63, 413 S.E.2d at 609-10 (1992)
 
 
 [7]
 Ney has asserted that because WE & A employees participated in a profit sharing plan under I.R.C. Sec. 401 (1993), they could be considered "owners" of the business. She cites no authority for the proposition that a monetary interest in a qualified retirement plan qualifies as ownership of a business enterprise