**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

FRANKLIN M. HALSEY, d/b/a Old
Dominion Capital; THE MEDIA
GROUP,
<u>Plaintiffs-Appellees,</u>

v.                                                                No. 96-1298

URBAN TELECOMMUNICATIONS
CORPORATION; URBAN BROADCASTING
CORPORATION; THEODORE M. WHITE,
<u>Defendants-Appellants.</u>

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.
James H. Michael, Jr., Senior District Judge.
(CA-95-35-3-C, BK-93-47-A, BK-93-461)

Argued: July 18, 1996

Decided: August 27, 1996

Before MURNAGHAN and ERVIN, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Jeffrey Louis Squires, SQUIRES & CHOATE, P.L.C.,
Alexandria, Virginia, for Appellants. Melvin Earl Gibson, Jr., TREM-
BLAY & SMITH, Charlottesville, Virginia, for Appellees. **ON**

**BRIEF:** Andrew O. Reilly, SQUIRES & CHOATE, P.L.C., Alexandria, Virginia, for Appellants. Patricia D. McGraw, TREMBLAY & SMITH, Charlottesville, Virginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The instant case involves an alleged breach of an agreement to pay a commission, or finder's fee, for the location of financing for the construction and operation of a television station in Washington, D.C. After several proceedings in the bankruptcy and district courts, two companies and their principal were judged liable for commission payments in the amount of $1.26 million. On appeal, they challenge the decision on several grounds. Finding no error in the district court's findings and conclusions, however, we affirm its judgment and opinion.

I

Theodore M. White is the president and sole shareholder of Urban Telecommunications Corporation ("UTC"), a Virginia corporation he organized in order to establish a television station to broadcast on Channel 14 in Washington, D.C. After UTC received a construction permit from the Federal Communications Commission ("FCC") in 1988, White sought financing for the project. He turned to Franklin M. Halsey, an investment banker, for help. On June 8, 1988, UTC, White and Halsey executed an agreement whereby UTC engaged Halsey as its exclusive representative to raise the capital necessary for building and operating the station.[1] The agreement entitled Halsey to

_____

[1] Articles II and III of the contract provide that during the nine months from June 7, 1988, to March 7, 1989, Halsey "will attempt to raise at least $2,000,000 (and such additional amount as may be necessary to put the station on the air and operate for a period of one year) of debt or equity funds for [UTC] . . . from investors."

2

12% of the funds raised. The contract also provided that, while any party could terminate the agreement after a certain date, Halsey would remain entitled to the commission if UTC completed a plan of capitalization with an investor Halsey had located during the term of the agreement.[2] Halsey executed the agreement on behalf of his company, while White signed both as president of UTC and as an individual.

Halsey enlisted The Media Group and its principal, Dennis Rooker, to assist him in his endeavors. Halsey and Rooker located HSN Silver King Broadcasting Company, Inc., a wholly-owned subsidiary of Home Shopping Network, Inc. (collectively "HSN"), which agreed to finance Channel 14. During negotiations with HSN, UTC terminated the exclusivity provision of the agreement with Halsey but promised in writing that he would still receive his commission "if there is consummation of the proposal with Home Shopping Network that you brought to our attention."[3]

In January 1989, White and UTC accepted HSN's financing proposal. Subsequently, the deal began to take shape as agreed upon. White incorporated Urban Broadcasting Corporation ("UBC") to own and operate Channel 14. In addition to being president and sole director of UBC, White also became the sole voting shareholder, exercising his option to own personally 55% of its stock. HSN held a 45% ownership interest in the form of non-voting stock, but could not convert that stock to voting shares until eighteen months after the station started broadcasting. In addition, UBC gave HSN a security interest in UBC's assets and White pledged all of his UBC stock to HSN.

_____

[2] Article IX states in pertinent part:

> In the event that this Agreement is terminated or expires prior to the capitalization of [UTC] being completed, then Halsey shall still be entitled to receive his compensation as set forth in Article IV in the event that [UTC] completes a plan of capitalization with an [investor] that has been brought to [UTC] by Halsey or that has discussed the purchase of [UTC]'s debt or equity with Halsey, [UTC], or White during the term of this Agreement.

[3] UTC terminated the agreement one day after the contract became terminable by any party.

HSN, UBC and White executed several documents as part of the financing deal, among them a loan agreement for $5.45 million, an assignment agreement transferring the construction permit for Channel 14 from UTC to UBC, and a standard television affiliation agreement committing Channel 14 to carry the programming of an HSN affiliate. The parties amended the loan agreement twice during the next three years to cover the increased costs and expenses associated with the construction of Channel 14. The total loan amount from HSN was $10.5 million.

Halsey and The Media Group never received any money for their efforts in locating HSN. Consequently, they sued UTC, UBC and White in state court for payment.[4] After filing a voluntary bankruptcy petition in Western District of Virginia, UTC removed the case to the bankruptcy court.

II

The trial centered on three issues: (1) whether White was personally liable for the commission payments; (2) whether UBC was liable for UTC's obligations under the agreement with Halsey as its "successor"; and (3) whether Halsey and The Media Group were entitled to finder's fees based only on the original loan amount, not the final sum. The bankruptcy court entered judgment for Halsey and The Media Group against UTC in the amount of $654,000, or 12% of the original loan amount of $5.45 million, but denied recovery against White personally or against UBC as UTC's successor.

On appeal, the district court reversed the bankruptcy court's judgment regarding White's individual liability and remanded the case for further findings as to UBC's liability and the proper amount of the commission. On remand, the bankruptcy court determined that UBC was liable as UTC's successor and that Halsey and The Media Group were entitled to a commission based on the full $10.5 million from HSN plus interest. The district court affirmed, leading UTC, UBC and White to appeal.

_____

[4] Although originally named as a defendant, HSN was subsequently dismissed from the suit.

4

III

Exercising our plenary review over bankruptcy matters but keeping in mind that the bankruptcy court's findings of fact may not be set aside unless clearly erroneous, see First Nat'l Bank of Maryland v. Stanley (In re Stanley), 66 F.3d 664, 667 (4th Cir. 1995), we concur with the district court's analysis and conclusions. Virginia law governs the substantive issues on appeal by virtue of the choice of law clause in the June 8, 1988, agreement between Halsey, UTC and White.

A

Appellants first contend that White cannot be held personally liable for payment of the commission. Both the bankruptcy and district courts appropriately turned to the June 8, 1988, agreement, found it to be clear and unambiguous and proceeded to construe its terms as a matter of law. See Burns v. Eby & Walker, Inc. , 308 S.E.2d 114, 116 (Va. 1983) (the court interprets a clear and unambiguous contract as a matter of law and ignores parole evidence that introduces ambiguity). They disagreed on the issue of White's personal liability, however.

We agree with the district court's finding that the contractual language along with Whites dual signatures rendered him both personally and professionally liable for the commission payments.[5] See Clinch Valley Physicians, Inc. v. Garcia, 414 S.E.2d 599, 601 (Va. 1992) (Virginia law requires the court to construe the contract in its entirety to ascertain the intent of the contracting parties from the written words). The court appropriately observed that in the absence of language limiting Whites capacity or severing his liability, Virginia common law renders a party to a contract responsible for its whole performance. See Link v. Weizenbaum, 326 S.E.2d 667, 669 (Va. 1985) ("[W]here two or more parties jointly contract to do a single

_____

[5] The agreement lists White as a party, then names him throughout. Not only does White, a sophisticated businessman, gain substantially from the arrangement, but the contract expressly provides that the agreement benefits and binds both UTC and White.

5

act, each is bound for the whole performance."); see also Restatement (Second) of Contracts §§ 288(2), 289(1) (1981).

B

Appellants next contend that UBC cannot be held liable for the commission payments under principles of successor corporate liability. Again, we find, however, that the district court correctly applied the "mere continuation" exception to the general rule of non-successor corporate liability to find UBC accountable for the fees.

While the basic rule in Virginia holds that a purchasing corporation may not be held liable for obligations of the selling corporation, an exception exists for a successor which is merely a continuation of its predecessor. See Harris v. T.I., Inc., 413 S.E.2d 605, 609 (Va. 1992); People's Nat'l Bank of Rocky Mount v. Morris, 148 S.E. 828, 829 (Va. 1929). In applying that exception, the district court properly determined that absolute identity between the companies is not required. Virginia precedent simply does not create that standard, but instead calls for common identity of management, operation and ownership.6 See Harris, 413 S.E.2d at 609 ("A common identity of the officers, directors, and stockholders . . . is the key element of a `continuation.'"); Pepper v. Dixie Splint Coal Co., 181 S.E. 406, 410 (Va. 1935) (finding continuation based principally on identity of ownership and management); see also Crawford Harbor Assocs. v. Blake Constr. Co., 661 F. Supp. 880, 885 (E.D. Va. 1987) (construing Virginia law as having identified three continuity factors -- identity of ownership and management and the absence of consideration for the assets transferred -- as most important).

The district court correctly observed such shared identity between UTC and UBC. Because ownership did not change hands and White remained in control of both corporations, the court determined that "actual and ultimate control and ownership of the property and business of the . . . companies was lodged" in White. 7 Pepper, 181 S.E.

_____

6 We agree with Appellees' suggestion that imposing such an absolute standard would invite manipulation to avoid liability.
7 White is president and sole shareholder of UTC and president and majority shareholder of UBC. White holds a 55% ownership interest in UBC, while HSN has a 45% non-voting interest.

6

at 410. The court further found inadequate consideration in connection with the relevant transactions and that, after transferring its license to UBC, UTC, for all practical purposes, ceased to exist. In addition, the court appropriately determined that, because the transactions regarding UTC and UBC were not made at arms length, the mere continuation exception remained applicable. See Harris, 413 S.E.2d at 609 (explaining that a "bona fide, arms-length transaction" negates the exception).

In short, White and UTC needed to raise capital for the television station. HSN agreed to provide that financing but insisted on owning a portion of the venture. Thus, a new corporation-- UBC -- was formed. White continued in complete voting-shareholder control, but HSN received a 45% non-voting interest. That ownership interest alone does not negate the continuity between UTC and UBC as it resulted solely from the efforts of White and UTC to obtain financing. The district court properly determined that UBC was a mere continuation of UTC responsible for meeting its obligations.

C

Appellants last contention is that the commission cannot properly be based upon the full amount of the HSN loan rather than upon the initial agreed-upon sum. Again, the district court properly interpreted the June 8, 1988, contract to provide otherwise.

Because Virginia law forbids courts from rewriting contracts, see Wilson v. Holyfield, 313 S.E.2d 396, 398 (Va. 1984), the court strictly construed the terms of the agreement to entitle Halsey to a commission on the full amount of capitalization. The contract provides that Halsey is "entitled to receive 12% of the amount of money raised for [UTC]." Furthermore, it guarantees that Halsey is to be paid despite termination of the agreement, as long as UTC completes a plan of capitalization with an investor he secured during the existence of the contract.

That is precisely what happened. UTC and White terminated Halseys contract soon after he told them about HSN, yet they went on to consummate a capitalization agreement. We agree with the district court's reading of the contract to mean that the capitalization plan

7

with HSN became complete when enough money had been secured to cover the station's construction and first-year operation costs. The agreement simply contains no language limiting the funds to be raised or the amount to be paid Halsey in the event that he located a successful source of financing for the station.**8** Thus, as the district court concluded, Halsey is entitled to a 12% commission on the full amount of the HSN loans, or $1.26 million.

IV

For the foregoing reasons, the district court's order is

AFFIRMED.

_____

**8** While Appellants argue that the commission must be circumscribed by the parties' expectation regarding the financing required to construct and then to operate the station for one year, there is no such limitation contained in the agreement. Nor, as the district court found, is there any evidence of cost forecasting at all by the parties. The agreement does provide some target fund-raising figures, but those amounts are couched in flexible terms.