PUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KAISER FOUNDATION HEALTH PLAN OF
THE MID-ATLANTIC STATES,
Plaintiff-Appellant,

v.                                                                    No. 96-1818

CLARY & MOORE, P.C.; MATTHEW A.
CLARY, III,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, District Judge.
(CA-94-1098-A)

Argued: January 30, 1997

Decided: September 10, 1997

Before HALL and ERVIN, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Reversed by published opinion. Judge Ervin wrote the opinion, in
which Judge Hall and Senior Judge Butzner joined.

_____

**COUNSEL**

**ARGUED:** Gary Miller Zinkgraf, FOLEY & LARDNER, Washing-
ton, D.C., for Appellant. Judith Lynne Wheat, CACHERIS &
TREANOR, Washington, D.C., for Appellees. **ON BRIEF:** Paul R.
Monsees, Alan D. Rutenberg, FOLEY & LARDNER, Washington,

D.C., for Appellant. Gerard Treanor, CACHERIS & TREANOR, Washington, D.C., for Appellees.

_____

**OPINION**

ERVIN, Circuit Judge:

Kaiser Foundation sued Clary & Moore, a law firm, and Matthew Clary, III, in an effort to obtain payment of a judgment which Kaiser had secured against Clary, Lawrence, Lickstein & Moore ("Clary, Lawrence"), Clary & Moore's corporate predecessor. Kaiser raised three claims at the bench trial before the district court: (1) successor liability, (2) piercing the corporate veil, and (3) fraudulent conveyance. The court ruled in Clary & Moore's favor on all counts. Kaiser now appeals with respect to the claims of successor liability and fraudulent conveyance. For the following reasons, we reverse.

I

Clary, Lawrence was a law firm founded in 1976 by Colonel Matthew Clary, Jr. (Clary Jr.) under a different name; it was named Clary, Lawrence in 1985. From 1976 forward, Clary Jr. was the majority stockholder of the firm, owning 57% of the stock, and Matthew Clary, III ("Clary III"), his son, was a minority shareholder with 42% of the stock; other partners owned a very small amount of the firm's stock. Until 1990, Clary Jr. was president, Clary III was vice-president, and other partners were officers of the firm. Slight changes took place among the lower officers over the years. In October 1990, all the directors and officers resigned from Clary, Lawrence except Clary III, who became the sole director and president.

Clary, Lawrence began to suffer severe financial difficulties in 1990. The firm owed $110,000 in back taxes and owed a large amount to Sovran Bank, its primary creditor. Sovran's claim against Clary, Lawrence exceeded $600,000 at one point in the 1990s, but in 1991 the outstanding debt was about $574,000. Sovran's debt was personally secured by Clary Jr., his wife, and Clary III.

2

By this time the firm also owed around $40,000 to Kaiser. Kaiser had prevailed against the firm in a 1990 lawsuit for unpaid rent on the firm's former corporate office space, which it leased from Kaiser. Although as of 1990 Kaiser had not yet been awarded attorney's fees for the lawsuit, it would obtain a judgment for more than $230,000 for those fees on March 7, 1991. Kaiser's total judgment against Clary, Lawrence is $271,690.57.

In response to Clary, Lawrence's dire financial straits, the partners began to plan to close the firm and open a new one. Clary & Moore was founded in October 1990, although it was called The Business Law Firm for the first couple of months. It officially became Clary & Moore, and opened its doors for business, on February 18, 1991. From the very beginning of Clary & Moore, Clary III was the sole shareholder, the president, and the sole director of the firm.

Five partners, three associates, and one attorney serving as of counsel from Clary, Lawrence ultimately joined Clary & Moore; three other attorneys left for other firms at some point prior to or during the transition. However, on February 18, all of the attorneys who would join Clary & Moore were still on the payroll of Clary, Lawrence; they were not officially hired at Clary & Moore until March 31, 1991. During the intervening six weeks, Clary & Moore "leased" the services of the Clary, Lawrence attorneys, paying Clary, Lawrence the same amount Clary, Lawrence actually paid the attorneys through salary and benefits. Clary & Moore in turn billed its clients at a standard billing rate, a rate much greater than it paid Clary, Lawrence. Therefore, Clary & Moore made a profit on the services of these attorneys while Clary, Lawrence did not. Services of staff members were also leased to Clary & Moore by Clary, Lawrence, and some of those leases lasted until April 1991. In addition, Clary & Moore leased office furniture and equipment from Clary, Lawrence for $5,000 each month, an amount that expert testimony at trial showed to be quite generous. Clary & Moore could not pay its various leasing obligations to Clary, Lawrence in cash, so the old firm allowed the new firm to pay the debts with some cash and with promissory notes and the old firm loaned the new firm $1500 in cash at one point. Clary & Moore also used Clary, Lawrence's law library during these months, although it did not specifically pay for that privilege. Clary & Moore

3

also continued to operate in the same office space, with the same address and telephone numbers, as Clary, Lawrence had used.

In addition, it appears that almost all of Clary & Moore's clients when it opened its doors had been the clients of Clary, Lawrence. Both firms communicated with the clients about the changes and asked if they would care to be represented by Clary & Moore. A number of clients of Clary, Lawrence did not accept the services of Clary & Moore, but instead employed the former Clary, Lawrence lawyers who had left for other firms. It appears, however, that Clary & Moore's client list and the nature of its practice was substantially identical to that of Clary, Lawrence. Moreover, at firm meetings discussions would address the affairs of both the old and the new firms.

Clary, Lawrence was dying while Clary & Moore was setting up shop. In October 1990, all of Clary, Lawrence's attorneys resigned as shareholders and directors in Clary, Lawrence, with the single exception of Clary III. Kaiser obtained an "execution and levy" on remaining Clary, Lawrence assets, which, according to Clary & Moore, made it difficult for Clary, Lawrence to make its payments to Sovran Bank. After several months of financial stagnation, Sovran Bank foreclosed on Clary, Lawrence in August 1991, with the consent and cooperation of the firm. Sovran had long held a security interest in Clary, Lawrence's assets which explicitly covered almost everything, although it did not specifically list the "database information" on the firm's computers.

A public foreclosure sale was held in an attempt to raise enough capital to cover Clary, Lawrence's debt to Sovran bank. On its face the auction was by-the-book. It was widely advertised and attended by the public. The furniture, fixtures, equipment and law library were sold through the public auction for $265,200. It is not surprising that Clary & Moore was the purchaser for these goods, nor that Sovran Bank loaned the new firm the money for the purchase based on the personal guarantees of Clary Jr., Clary III and Clary Jr.'s wife.

Clary, Lawrence's accounts receivable were also sold at the auction to The Finance Company for $286,000. Included in these accounts receivable were the newly created notes showing Clary & Moore's leasing debts of more than $80,000 to Clary, Lawrence. Again, it is

4

not surprising that The Finance Company had been one of Clary, Lawrence's loyal clients, and that Clary Jr. personally guaranteed that The Finance Company would recoup through collections of the accounts what it bid for them at the auction. Ultimately, Clary Jr.'s wife, Mary, purchased Clary & Moore's promissory note from The Finance Company, and there is no evidence in the record that that debt was ever repaid. Soon thereafter, Clary Jr. also wrote a check to The Finance Company for almost $160,000, fulfilling his promise to cover any difference between what the Company was able to recoup on the accounts receivable and what the Company had paid for them.

Almost enough was raised through the auction to satisfy Clary, Lawrence's obligations to Sovran Bank. This was perhaps a predictable result because Clary Jr. and Clary III planned the bids that would be offered for the accounts receivable and the furniture, fixtures and equipment to approximate the outstanding debt to Sovran. It also appears that Clary, Lawrence made arrangements for the payment of its debts to the Internal Revenue Service. However, after the foreclosure, Clary, Lawrence had no money left to satisfy Kaiser's judgment worth more than $270,000, made no arrangements to pay that debt, and soon entered bankruptcy.

II

Kaiser initiated this suit to obtain payment of its judgment. Kaiser alleges that the conversion of Clary, Lawrence into Clary & Moore was done solely to avoid paying the debt to Kaiser. Clary & Moore asserts that it is a completely separate corporate entity from Clary, Lawrence and that it was created to avoid many of the financial and organizational problems of its predecessor, not to avoid a single creditor. The district court agreed with Clary & Moore and, although some of its conclusions are not explicit in the record, the court seemingly found in Clary & Moore's favor on every question and issue before it.

On appeal, Kaiser suggests two theories pursuant to which it claims it is entitled to recover. Kaiser argues that Clary & Moore is a mere continuation of Clary, Lawrence, and as such it is liable for its predecessor's debts. Kaiser also argues that the transfers of assets from Clary, Lawrence to Clary & Moore were all fraudulent in violation of

5

section 55-80 of the Code of Virginia. Because we find that the theory of successor liability holds water, and entitles Kaiser to full recovery, we decline to address whether the individual conveyances from Clary, Lawrence to Clary & Moore were themselves fraudulent.

III

Before proceeding to the merits of this case, we must address two preliminary legal matters: choice of law and standard of review. We note that both parties and the district court have applied and relied upon Virginia law in this litigation, but we are unable to discover in the record whether there was ever any discussion of which state's law in fact governs. Although the record on appeal does not contain many important jurisdictional facts, it appears from the information before us that Virginia law is in fact appropriate. See Ambrose v. Southworth Prod. Corp., 953 F. Supp. 728, 734 (W.D. Va. 1997). However, because neither party questions the applicability of Virginia law, we will assume without deciding that it properly controls our decision.

With respect to the standard of review, we must review the district court's factual findings for clear error and its legal conclusions de novo. See Waters v. Gaston County, N.C., 57 F.3d 422, 425 (4th Cir. 1995); F. R. Civ. P. 52(a). In the instant case, the district court did not issue a written opinion but instead ruled from the bench, and in that ruling the court made very few specific factual findings. Instead, the court mostly issued legal conclusions without much exploration of the facts that gave rise to those conclusions. Therefore we will independently decide whether the record contains sufficient facts to support the lower court's conclusions of law.

IV

We turn now to the issue of successor liability. In Virginia, as in most states, a company that purchases or otherwise receives the assets of another company is generally not liable for the debts and liabilities of the selling corporation. Blizzard v. National R.R. Passenger Corp., 831 F. Supp. 544, 547 (E.D. Va. 1993); Crawford Harbor Assoc. v. Blake Constr. Co., 661 F. Supp. 880, 883 (E.D. Va. 1987). There are four traditional exceptions, each recognized in Virginia, to this rule against successor liability.

> In order to hold a purchasing corporation liable for the obligations of the selling corporation, it must appear that (1) the purchasing corporation expressly or impliedly agreed to assume such liabilities, (2) the circumstances surrounding the transaction warrant a finding that there was a consolidation or de facto merger of the two corporations, (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is fraudulent in fact.

Harris v. T.I., Inc., 413 S.E.2d 605, 609 (Va. 1992).[1] See also Crawford Harbor, 661 F. Supp. at 883. In the instant case, Kaiser alleges that Clary & Moore should be liable as a mere continuation of Clary, Lawrence, pursuant to the third exception.

A

Although there is no absolute legal standard for determining whether one corporation is in fact a mere continuation of another, courts in Virginia adhere to the "traditional view" and have identified numerous factors which can help in the determination. See Crawford Harbor, 661 F. Supp. at 885; Blizzard, 831 F. Supp. at 548. The most critical element in proving a continuation is showing the same ownership of the two companies, a "common identity of the officers, directors, and stockholders in the selling and purchasing corporations."[2] Harris, 413 S.E.2d at 609; see also Blizzard , 831 F. Supp. at 548. It is also relevant whether the new corporation continues in the same business as its predecessor, although courts point out that this is less important than identity of ownership. Crawford Harbor, 661 F. Supp. at 885. In addition, when transfer of the selling company's assets was done for less than adequate consideration, a purchasing corporation is likely to be a mere continuation. Id. The Virginia Supreme Court has also emphasized that a new corporation is not a mere continuation when the purchase of the seller's assets occurred in a bona fide,

---

[1] There is also a fifth exception, the "product line exception," recognized in some states. Virginia has explicitly declined to adopt the new exception. Harris, 413 S.E.2d at 609.

[2] We will discuss below, subsection C infra, whether the ownership of the two companies need be identical, or whether strong similarity will suffice in reaching a finding of successor liability.

7

arm's-length transaction. Harris, 413 S.E.2d at 609. Additional factors include whether two corporations or only one remain after the transactions at issue and whether the new company continues in the old offices with the same telephone number and address as the old company. Blizzard, 831 F. Supp. at 548.

A district court in Pennsylvania has also provided some additional useful guidance on the issue of continuity. See Fiber-Lite Corp. v. Molded Acoustical Prods., 186 B.R. 603, 609 (E.D. Penn. 1994), aff'd, 66 F.3d 310 (3d Cir. 1995).3  The Fiber-Lite court suggests that factors such as identity of the companies' assets, management, location, and operations are relevant to the question of continuity. Id. at 609-10. More importantly, Fiber-Lite emphasizes that courts must not "elevate form over substance" when addressing the issue of successor liability. Id. at 610. Fiber-Lite is a case much like the instant one in that the selling and buying corporations tried very hard to make the new corporation appear to not be a successor; the court there, however, concluded that the corporations did not manage to hide the essential character of the new company as a mere continuation. Id. at 610.

B

When the facts of the instant case are viewed in light of the factors discussed above, it is apparent that Clary & Moore is in fact a mere continuation of Clary, Lawrence.

As between Clary, Lawrence and Clary & Moore there is, to a large degree, a common identity of ownership and directorship. First, at the time of the creation of Clary & Moore, all of the officers and directors of Clary, Lawrence resigned, save one. Clary III became the sole officer and sole director of Clary, Lawrence in October 1990, and remained so through the eventual end of the company in 1992. Clary III was also the sole director of Clary & Moore from its inception in February 1991, to the present.

_____

3 Although Fiber-Lite does not concern Virginia law, it nonetheless provides us guidance. We note that there are relatively few Virginia cases which directly address successor liability, and those cases do not purport to set forth absolute rules regarding most aspects of the issue.

8

Clary & Moore argues that, prior to October 1990, Clary, Lawrence had several directors, ranging from five to eight at any given time between 1976 and early 1990. However, we note that, even when Clary III was not the sole director, he was one of the directors throughout the firm's life. Moreover, we are persuaded that the make-up of Clary, Lawrence just prior to its conversion to Clary & Moore, when it was responding to the Kaiser judgment, is more relevant than its make-up at other points in its history.

Second, there is substantial overlap in the ownership of the two companies. Clary III owns 100% of the stock of Clary & Moore and he owned 42% of the stock in Clary, Lawrence. Clary Jr. owned 57% of Clary, Lawrence stock. Further, even though Clary Jr. does not own shares in Clary & Moore, he still has a substantial financial interest in the company because he is a guarantor, along with his wife and Clary III, of Sovran's loan to Clary & Moore of more than $260,000. This money was used by Clary & Moore to purchase Clary, Lawrence's furniture, fixtures, equipment and library.

Third, there is overlap between the officers of the two firms. Between October 1990 and the eventual demise of Clary, Lawrence, Clary III was the president and only officer of Clary, Lawrence. When Clary & Moore opened its doors in February 1991, Clary III was also the president of the new firm. Clary Jr. also played a role in both firms. For years, prior to October 1990, he was president of Clary, Lawrence and he became the vice president of Clary & Moore from the time it opened. Another individual also held a lesser office in both firms. Keith Swirsky became the secretary and treasurer of Clary & Moore when it opened and he was also the treasurer of Clary, Lawrence in 1990. Given that the new firm had only three officers filling four positions, it is significant that all three had also been officers at Clary, Lawrence.

It is clear that there was substantial overlap in the ownership, the officers, and the directors of the two firms, so we find that this factor militates strongly in favor of a finding of successor liability. However, Clary & Moore urges us to find that this factor supports its position because complete identity of directors, officers, and, especially, shareholders, is lacking. We have reviewed the relevant Virginia case law and, although it is far from clear on this point, we find that abso-

9

lutely identical ownership between the two corporations need not be present. See Urban Telecom. v. Halsey, No. 95-00035-C, 1996 WL 76160 at *3 (W.D. Va. Feb. 8, 1996) (tracing Virginia law and finding that determinative factor is whether ultimate control of the two companies is the same, rather than strictly identical ownership), aff'd, 95 F.3d 41 , No. 96-1298, 1996 WL 492682 (4th Cir. Aug. 27, 1996). We note that this is by no means a clearly settled rule of law. Compare Halsey, 95 F.3d 41, 1996 WL 482682 at *3 (unpublished opinion affirming district court's finding that absolute identity not required), with Ney v. Landmark Educ. Corp., 16 F.3d 410, No. 92-1979, 1994 WL 30973 at *8 (4th Cir. Feb. 2, 1994) (unpublished opinion holding that 100% identity is required). Nonetheless, we agree with the district court in Fiber-Lite, 186 B.R. at 610, that form must not be elevated over substance in deciding the issue of successor liability. We cannot allow a corporation which, by all indications is under the same control as its predecessor, to avoid its legitimate debts by manipulating superficial indicia of ownership. Therefore, we find that in the instant case the strong commonality of ownership and control between Clary & Moore and Clary, Lawrence suggests that the new firm is a mere continuation of the old one.

Another factor relevant to our decision is whether the business conducted by the two corporations is the same. In the instant case, it is undeniable that Clary & Moore not only entered the same general type of business as that in which Clary, Lawrence was engaged, but also assumed Clary, Lawrence's exact business. Clary & Moore took over the overwhelming majority of Clary, Lawrence's clients when it opened shop; in fact, Clary & Moore began to represent and bill Clary, Lawrence's clientele before the new firm even had any lawyers in its actual employ, while it was still leasing lawyers from Clary, Lawrence. Tom Callahan, a lawyer who moved from the old firm to the new one, testified as follows at his deposition:

> Q: And are you aware of whether there was a difference for the other lawyers who came with Clary & Moore?
>
> A: In terms of day-to-day practice, it was the same, same clients, same staff, same office, same firm.
>
> [. . .]

10

Q: Did you -- what clients did you start doing work for on February 18, 1991?

A: Exactly the same. There was no difference.

J.A. 211. When the new firm opened on February 18 it did so with almost all of the same attorneys, the same staff, office, address, telephone number, fixtures, furniture, equipment, files and clients as the old firm. It is undeniable that Clary & Moore continued in the business of its predecessor.

An additional factor for our consideration is the way in which the transfer of assets from the old corporation to the new one was conducted. Specifically, it is relevant whether the transfers were for adequate consideration and whether they were bona fide arm's-length transactions. See Blizzard, 661 F. Supp. at 885 (discussing Pepper v. Dixie Splint Coal Co., 181 S.E. 406 (Va. 1935)); Harris, 413 S.E.2d at 609. In the instant case, most of Clary, Lawrence's assets were transferred to Clary & Moore in one way or another. As mentioned, Clary, Lawrence leased its furniture, fixtures, equipment, attorneys and staff to Clary & Moore for periods ranging from six weeks to five months. Eventually, Clary & Moore purchased most of Clary, Lawrence's assets at a foreclosure sale. We find that, although some of the transactions were bona fide arm's-length transactions for consideration, others were not.

Kaiser argues that all of these leases were for inadequate consideration. With respect to the lease of the furniture, fixtures and equipment, the only evidence presented to the district court indicates that Clary & Moore paid more than market value for use of these physical assets. This lease was a legitimate transaction. Although Clary & Moore did not specifically lease the law library from Clary, Lawrence, it paid enough for the other items to cover a reasonable lease rate for the law books as well.

However, with respect to the lease of the services of Clary, Lawrence's staff and attorneys to Clary & Moore, we conclude that adequate consideration was not given. The evidence showed that Clary & Moore paid or gave promissory notes for the amount that Clary, Lawrence actually paid the employees. Clary & Moore then billed cli-

11

ents for these services at a much higher rate and passed none of these profits back to Clary, Lawrence. Clary & Moore argues, and the district court apparently accepted, that this lease arrangement cannot have been improper because it was properly documented and Clary, Lawrence did not lose money on the arrangement. We find, however, that no business operating at arm's-length with another would lease its most valuable asset at cost. Not only did Clary, Lawrence not profit from this transaction, but it was precluded from making a profit during the lease period because its attorneys were all primarily doing work for another company. By leasing the services of its attorneys and giving its case load to Clary & Moore, Clary, Lawrence diverted its full income stream and received nothing in return. One cannot avoid the impression that this action was taken to stop any new money from filling Clary, Lawrence's coffers because that money would have to be surrendered to Kaiser.

Kaiser argues that all of the sales of assets following the leases were also illegitimate.[4] Clary & Moore responds that, because the transfer of assets occurred at a public foreclosure sale, it was necessarily a bona fide arm's-length transaction and therefore beyond reproach. We are not completely swayed by either argument. In agreement with Clary & Moore, we find that, in general, the foreclosure sale had indicia of a standard legitimate transaction. The sale was conducted by a professional auction service, was very widely advertised to the public and the legal community, and was fairly well attended.

However, several other facts about the foreclosure sale do give us considerable pause. First, the fact that almost all of the items for sale went to Clary & Moore supports Kaiser's position that the new firm merely continued in the very business of the old firm. Second, the sale

_____

[4] Among other allegations, Kaiser asserts that it was improper for Clary, Lawrence's "intangible assets," including computer files and database information, to be sold at the foreclosure sale because Sovran's lien did not cover these assets and therefore they were not subject to foreclosure. While we are unpersuaded that these intangibles were of value to anyone but the attorneys who created them, our finding of successor liability obviates our need to decide whether it was improper for these items to be included with the computers at the sale.

of the accounts receivable, the only item not directly transferred to Clary & Moore, was done under suspicious circumstances. Clary Jr. arranged for The Finance Company, a client of both the old and the new firms, to purchase Clary, Lawrence's accounts receivable by personally guaranteeing that The Finance Company would not lose money on its purchase. Clary Jr. also suggested the amount which the Finance Company should bid for the item; as it turned out, that amount, added to the amount that Clary & Moore intended to pay for the furniture, fixtures, equipment and law library, would be just about enough to cover the outstanding debt to Sovran but would not leave anything for the Kaiser judgment. The guarantee offer made to The Finance Company was not made to any other potential purchaser of the accounts receivable and was not made public to any other parties.

Included in the accounts receivable was an $80,000 promissory note from Clary & Moore to cover its earlier leasing obligations to Clary, Lawrence. Less than a year after the auction, Clary Jr.'s wife, Mary, purchased Clary & Moore's promissory note from The Finance Company. Soon thereafter Clary Jr. himself paid almost $160,000 to The Finance Company to make up the shortfall which The Finance Company had remained unable to recover from Clary, Lawrence's accounts receivable.

The unique circumstances surrounding the transfer of the accounts receivable causes us to question whether two of the transactions affecting Clary, Lawrence's assets were in fact legitimate. First, it appears that Clary & Moore never actually paid its promissory note to Clary, Lawrence for the lease of its various assets from February through March, and in some cases, through April or August, because Mary Clary purchased that note before it was collected. We become less convinced, therefore, that the leases were bona fide arm's-length transactions for consideration. Second, it appears that the accounts receivable were not sold to an outside party, as Clary & Moore asserts; instead, the principals of both the old and the new firms orchestrated a series of transactions which resulted in this asset being transferred from the old firm to Clary Jr., a major player in the new firm. Although we decline to hold that the transfer of the accounts receivable was in itself fraudulent, despite Kaiser's urgings, we find that it weighs in favor of a conclusion of successor liability.

13

Finally, we note that soon after the transfer of all of Clary, Lawrence's assets to Clary & Moore, Clary, Lawrence ceased doing business entirely. A final factor for our consideration is whether the transactions at issue resulted in the existence of only one company, or whether two separate companies continued to do business. In this case we find that the fact that Clary, Lawrence closed its doors supports our conclusion that Clary & Moore is simply a continuation of the old firm in new clothing.

C

When we weigh the factors iterated in Virginia law for determining successor liability, it becomes clear that Clary & Moore is a mere continuation of Clary, Lawrence. Although we need not so hold in order to hold Clary & Moore liable to Kaiser, we find specifically that the new firm was created with the express purpose of avoiding Clary, Lawrence's legitimate debt.[5] Between the two firms we find transfer of most assets, either directly or indirectly, for often inadequate consideration; very substantial commonality of ownership, directorate and administration; continuity of business; and continuity of control. We believe this case to be like National Carloading Corp. v. Astro Van Lines, 593 F.2d 559 (4th Cir. 1979), in which we found there to be successor liability. There, we found that the old company had transferred all of its assets, including those which were needed to conduct business, to a new company run by the same people.

> The purpose of the transaction was to avoid Van Lines' creditors. Astro purchased the only valuable asset of Van Lines (its right to do business) while Van Lines was in financial difficulty. With the transfer of the certificate (allowing the company to operate its trucks) Van Lines had

_____

[5] Clary & Moore argues that it was created to avoid all of the old firms' debts, not just Kaiser's outstanding judgment. We find this to be unpersuasive because Clary, Lawrence's other debts, including those to the I.R.S. and Sovran Bank, were ultimately satisfied by the firm. However, even if we were to credit Clary & Moore's argument, it would not be a defense that it tried to illegitimately avoid the legitimate claims of several creditors rather than the claim of one.

14

> neither money nor property nor operating ability. It was a shell with no way to pay its debts.

Id. at 562. In the same way, Clary, Lawrence transferred its employees, its clients, its office, its equipment and everything else to a new company, leaving itself no way to make money to satisfy its debts. Given the facts of this case, we hold that Clary & Moore must now be responsible for those debts.

V

Because we find in favor of Kaiser on the issue of successor liability, we decline to reach the related matter of fraudulent transfers. The judgment of the district court is

REVERSED.

15