## CIRCUIT COURT OF THE CITY OF RICHMOND

John M. Beck

v.

Virginia Sash
and Door, Inc., et al.

Case No. LL-1404

Thomas I. Sizer

v.

Virginia Sash
and Door, Inc., et al.

Case No. LL-1405

November 8, 2001

BY JUDGE T. J. MARKOW

Before the Court are two consolidated actions whereby plaintiffs Beck and Sizer sue Virginia Sash and Door, Inc., for payment on a note held by each plaintiff.

Prior to 1994, Plaintiffs John M. Beck and Thomas I. Sizer owned and operated Virginia Sash and Door, Inc., and Architectural Windows of Virginia, Inc. In 1994, Kelmor, Inc., purchased the assets of Virginia Sash and Door, Inc., and Architectural Windows of Virginia, Inc., after which Kelmor changed its name to Virginia Sash and Door, Inc., and did business under the name Architectural Windows of Virginia. The controlling shareholders of Kelmor were Dan Kelley and Emmett Morgan.

Virginia Sash entered into restrictive covenants not to compete and consulting agreements with Beck and Sizer in connection with the purchase of the business. These agreements initially called for Virginia Sash to make monthly payments to Beck and Sizer beginning in 1996 and extending through 2000 but were modified several times to adjust the payment schedules but not the total amount of $400,000 payable to each plaintiff.

By 1999, Virginia Sash was having trouble making its monthly payments to plaintiffs as well as a debt owed to Wachovia Bank. Virginia Sash principals Kelley and Morgan were personally liable on the debt owed Wachovia. As a result of Virginia Sash's difficulties, Wachovia desired to discontinue the lending relationship and advised Virginia Sash to find another lender. Virginia Sash contacted Citizen's & Farmer's Bank as well as B. B. & T., but found that neither would lend unless the debt to Beck and Sizer could be subordinated. Beck and Sizer refused to further amend their contracts with Virginia Sash, thus frustrating Virginia Sash's attempts to secure an alternative lender.

Following these unsuccessful attempts, Gary Cook, counsel for Virginia Sash, had discussions with Wachovia regarding what was characterized as a "friendly foreclosure." It was proposed that Wachovia hold a public secured party auction of the Virginia Sash assets in which Wachovia held a security interest, and Kelley and Morgan (or their surrogates) would purchase the assets at this sale for the balance of the Wachovia note. Virginia Sash and/or Kelley and Morgan intended to use a new corporation, funded with $200,000 in stockholder funds and a credit line commitment from Citizens & Commerce Bank to purchase the assets. The result would be to satisfy the debt to Wachovia and to eliminate the debt to plaintiffs.

On or about June 19, 2000, Cook incorporated Architectural Windows of Virginia Acquisition Corporation with Kelley and Morgan as the sole owners of Architectural Windows. On September 27, 2000, Wachovia conducted the foreclosure sale of Virginia Sash's accounts, inventory, and equipment pursuant to its security interest. The debt that Architectural Windows owed to Wachovia on or about September 26, 2000, was approximately $706,837 plus attorneys' fees and the costs of conducting the foreclosure sale. The final obligation to Wachovia totaled approximately $723,181.

Carolyn Catlett, an employee of Virginia Sash and Door and Architectural Windows attended the foreclosure sale as an employee of Architectural Windows. At the direction of Kelley and on behalf of Architectural Windows, Catlett bid $710,000 for the combined accounts, inventory, and equipment. Architectural Windows' bid was the only bid for the combined accounts,

inventory, and equipment. Subsequently Virginia Sash and Architectural Windows entered into a Conditional Asset Purchase Agreement through which Architectural Windows purchased the assets of Virginia Sash not subject to the foreclosure sale. These assets included any and all trademarks, trade names, addresses, and slogans, including the name "Architectural Windows of Virginia," license agreements, distribution agreements, leases, accounts receivable, inventory, maintenance, asset history records, customer lists, customer records, and general intangibles to include goodwill. Architectural Windows acquired these assets for the sum of $5,000.

On the date of the foreclosure sale, September 27, 2000, Architectural Windows's directors were Emmett Morgan, Daniel Kelley, and Anthony Markel; and Virginia Sash's directors were Emmett Morgan, Daniel Kelley, Anthony Markel, Ray Lanzi, and Troy Perry. On that date, Kelley owned a 32.61% interest in Virginia Sash and Morgan owned a 32.61% interest in Virginia Sash for a total combined ownership of 65.22%. On that date, Kelley owned a 57.14% interest in Architectural Windows and Morgan owned a 42.86% interest in Architectural Windows for a combined ownership of 100%. At the time of the foreclosure, Kelley was the president of Virginia Sash as well as the president of Architectural Windows.

Architectural Windows's vice president/secretary Carolyn Catlett, and its treasurer, Diana Creech, were employees of Virginia Sash prior to October 10, 2000. Prior to October 10, 2000, Virginia Sash conducted business at 1320 School Street in Richmond, Virginia, and, since that time, Architectural Windows has conducted virtually the same business from that same location. Architectural Windows does business under the duly registered fictitious name of Architectural Windows of Virginia, which name Architectural Windows purchased under the Conditional Asset Purchase Agreement. Twelve of Architectural Windows fourteen employees were also employees of Virginia Sash. Virginia Sash and Door, Inc., still exists, but has not conducted any business since October 10, 2000, the date that Architectural Windows began conducting business.

On October 5, 2001, Virginia Sash and Door, Inc., and Prime Builders, Inc., consented to judgment in favor of each plaintiff in the amount of $247,145.

Plaintiffs allege that Architectural Windows is liable for this debt under the theory of successor liability. Under Virginia law, a company that purchases or otherwise receives assets of another company is generally not liable for the debts and liabilities of a selling corporation, subject to four traditional exceptions: the purchasing corporation expressly or impliedly agreed to

assume such liabilities, circumstances surrounding transaction warrant finding that there was consolidation or *de facto* merger, the purchasing corporation is merely a continuation of the selling corporation, or the transaction is fraudulent in fact. *Kaiser Foundation Health Plan of the Mid-Atlantic States v. Clary & Moore*, 123 F.3d 201 (4th Cir. 1997).

In that Fourth Circuit case, the Kaiser Foundation sued Clary & Moore, a law firm, and Matthew Clary, III, in an effort to obtain payment of a judgment which Kaiser had secured against Clary, Lawrence, Lickstein & Moore ("Clary, Lawrence"), Clary & Moore's corporate predecessor. Kaiser raised three claims at the bench trial before the district court: (1) successor liability, (2) piercing the corporate veil, and (3) fraudulent conveyance. The court ruled in Clary & Moore's favor on all counts. Kaiser appealed with respect to the claims of successor liability and fraudulent conveyance.

The Court wrote:

> When we weigh the factors iterated in Virginia law for determining successor liability, it becomes clear that Clary & Moore is a mere continuation of Clary, Lawrence. Although we need not so hold in order to hold Clary & Moore liable to Kaiser, we find specifically that the new firm was created with the express purpose of avoiding Clary, Lawrence's legitimate debt. Between the two firms we find transfer of most assets, either directly or indirectly, for often inadequate consideration; very substantial commonality of ownership, directorate, and administration; continuity of business; and continuity of control.

Plaintiffs here rely upon the mere continuation exception, alleging common identity of ownership, officers, directors, and stockholders in the selling and purchasing corporations, which is the key element of a continuation. *Harris v. T.I., Inc.*, 243 Va. 63, 64, 413 S.E.2d 605 (1992). Plaintiffs also point out that the sale of assets in the Conditional Asset Purchase Agreement for less than value is further proof of mere continuation, Kaiser at 204, as well as alleging continuity of business and continuity of control.

As discussed above, the owners, officers, directors, and shareholders of Virginia Sash and Door, as of October 10, 2000, were virtually identical to the owners, officers, directors, and shareholders of Architectural Windows. Any differences were minimal to nonexistent and consequently irrelevant since plaintiffs are not required to prove that the officers, directors, and shareholders are absolutely identical. *Id.*

Plaintiffs argue further that under Virginia law, when the transfer of the selling company's assets was done for less than adequate consideration, the purchasing corporation is likely to be a "mere continuation," responsible for the selling company's debts. *Kaizer* at 205. Plaintiffs allege that the Conditional Asset Purchase Agreement between Virginia Sash and Architectural Windows is evidence of mere continuation because the sale was not for value or adequate consideration.

The Conditional Asset Purchase Agreement represents the sale of the assets of Virginia Sash not affected by the foreclosure sale. The assets listed above were transferred to Architectural Windows for $5000.

The December 31, 1998, Statement of Combined Financial Position for Virginia Sash and Door included total current assets of cash, customer accounts and inventory of $1,852,026, equipment valued at $202,783, and goodwill of $1,178,101. Kelley testified that he was unsure whether the goodwill was sold pursuant to the foreclosure sale or the Conditional Asset Purchase Agreement or even if it was transferred at all. If these assets were sold pursuant to the foreclosure sale, Wachovia received $710,000 for over $3,000,000 in assets or $2,000,000 without counting the goodwill. If the assets were sold pursuant to the Conditional Asset Purchase Agreement, Virginia Sash received $5000 for over $3,000,000 in assets or $2,000,000 without counting the goodwill. In any event, the evidence is clear that these assets were sold for less than adequate consideration.

The evidence with regard to continuity of business and continuity of control was undisputed. Defendants testified or stipulated to operating out of the same building, having the same phone and fax numbers, and keeping the same business cards. Further, Kelley admitted that he wanted the transition to be seamless for Marvin Windows and Doors. Defendant wanted to appear to be the same corporation for its customers and its main supplier. Thus the evidence is sufficient to support a finding of continuity of business.

Further, defendant stipulated to the ownership percentages discussed above. These percentages make it clear that Architectural Windows was controlled by virtually the same parties that controlled Virginia Sash before the foreclosure sale and Conditional Asset Purchase Agreement were consummated. This evidence is sufficient to establish continuity of control.

Consequently, the Court finds that plaintiffs have borne the burden of proving that Architectural Windows is a mere continuation of Virginia Sash and Door. However, the analysis does not end here because Virginia recognizes an "exception" to the "mere continuation" exception.

Defendant argues that when the purchase of all of the assets of a corporation is a *bona fide*, arm's-length transaction, the "mere continuation" exception does not apply. *Harris, supra.* Defendant further argues Architectural Windows' acquisition of Virginia Sash was a *bona fide* arm's-length transaction because Wachovia instituted the foreclosure and therefore sanitized the transaction, and thus the mere continuation exception does not apply in this case.

From the evidence, it was clear that, while Wachovia initiated the threat of foreclosure, Virginia Sash proposed the friendly form that the foreclosure actually took. The foreclosure sale resulted in only one bid; that one bid came from Architectural Windows and was within a few thousand dollars of the amount of the debt owed to Wachovia by Virginia Sash and guaranteed by Kelley and Morgan, the owners of Architectural Windows. The assets of Virginia Sash were placed beyond the debts of Beck and Sizer. The Court finds that these facts are sufficient evidence that this was not an arm's-length transaction and the "mere continuation" exception applies in this case.

Therefore, the Court finds that under the theory of successor liability, Architectural Windows of Virginia, Inc., is liable to plaintiffs Beck and Sizer for the debts of Virginia Sash and Door, Inc.

It is therefore ordered that, in Case No. LL-1404, the plaintiff, John M. Beck, have judgment against the defendant Architectural Windows of Virginia Acquisition Corporation for $247,145 plus interest thereon from May 1, 2000, plus the costs. It is further ordered that, in Case No. LL-1405, the plaintiff, Thomas I. Sizer, have judgment against the defendant Architectural Windows of Virginia Acquisition Corporation for $247,145 plus interest thereon from May 1, 2000, plus the costs.